1997-NMSC-024

940 P.2d 159

**In the Matter of G. Paul HOWES, Esq., An Attorney Admitted to Practice Before the Courts of the State of New Mexico.**

**No. 23414.**

Supreme Court of New Mexico.

May 21, 1997.

312

Virginia L. Ferrara, Chief Disciplinary Counsel, Albuquerque, Ray Twohig, Special Assistant Bar Counsel, Albuquerque, for Disciplinary Board.

Department of Justice, Eric H. Holder, Jr., Charles F. Flynn, W. Mark Nebeker, Washington, DC, Robert J. Gorence, Albuquerque, for Respondent.

## OPINION

### PER CURIAM:

This matter came before the Court following disciplinary proceedings conducted pursuant to the Rules Governing Discipline, 17–101 to 17–316 NMRA. Pursuant to Rule 17–316, G. Paul Howes requested that we review the recommendation of the disciplinary board that he be publicly censured for several violations of the Rules of Professional Conduct, 16–101 to 16–805 NMRA. Because of the significant questions of law involved and the existence of an issue of substantial public interest, we requested briefs from the parties. After a thorough review of the record of these proceedings and the arguments and briefs submitted, we adopt the recommendation of the disciplinary board.

### FACTS

In early August 1988, Billy Wilson (Wilson) was shot and killed in an apartment house in Washington, D.C. On August 23, 1988, Darryl Smith (defendant) was arrested for this murder and subsequently gave a lengthy videotaped statement to police, in which he admitted being at the scene of the murder but claimed that the murder had actually been committed by a Larry Epps.

Public Defender Jaime S. Gardner was appointed to represent defendant, and respondent, who was at all material times an attorney licensed by this Court, represented the United States. At the time of the events giving rise to the charges in this case (November 1988,) respondent practiced law as an Assistant United States Attorney (AUSA) in the Superior Court of the District of Columbia pursuant to the authorization of the United States Attorney General under 28 USC § 517.[1]

On August 24, 1988, defendant appeared for presentment in the Superior Court of the District of Columbia and was ordered held without bond until a preliminary hearing could be held. On September 6, 1988, respondent moved the court to release defendant on his own recognizance pending further investigation of the case. Prior to defendant's release, respondent indicated to the public defender that he would like to speak with defendant about the case; however, she refused permission unless respondent was willing to offer her client complete immunity, which he was not willing to offer.

Between September 26 and October 5, 1988, defendant contacted District of Columbia Metropolitan Police Detective Donald R. Gossage (detective) on several occasions and made statements to him about the Wilson murder and two other murders. The detective told respondent about these statements. Respondent had no personal experience with a defendant who contacted police to discuss his own case, but office policy permitted him to deal with witnesses who were represented by counsel in other cases without notifying their attorneys. Respondent discussed the situation with the chief of the felony section, who told him to advise the detective that if

---

1. 28 USC § 517 directs that "the Solicitor General, or any other officer of the Department of Justice, may be sent to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

defendant were to initiate further contact with the detective, the detective could listen but that he was not to initiate contact with defendant. There was no discussion about whether to notify the public defender. Respondent relayed the message to the detective and told him as well to make notes of anything defendant might say, so that any inconsistent statements could be used for impeachment purposes.

The public defender first learned of these contacts with her client through testimony presented at his preliminary hearing on October 5, 1988. Probable cause was found to charge defendant with the murder of Wilson, and he was remanded to custody and ordered held without bond. Defendant's attorney complained in open court about the contacts with her client made without her knowledge and asked the court to issue a directive that there be no further contacts with defendant. Respondent stated that he expected no further contacts with defendant but added that "if he wants to call us, we will take his call." The court issued no directive but observed on the record that the public defender would undoubtedly instruct her client that such contacts were not in his best interest.

Between October 5 and November 1, 1988, however, defendant continued his efforts to contact the detective from the jail. He left messages for the detective on his beeper and even spoke with him on several occasions regarding the Wilson murder and the other two cases (wherein he was not charged and, therefore, not represented by counsel.) Respondent was aware that defendant was talking about the Wilson murder to the detective but did not notify the public defender or obtain her permission for the detective to discuss the case with her client.

On November 18, 1988, the detective was in respondent's office working with him on the Wilson murder case when respondent himself received a call from defendant on his private line. Respondent had never given his private number to defendant, although he had given it to the detective. At respondent's request, the detective listened in on an extension. Although defendant was advised that he did not have to speak with defendant and the detective and that his lawyer would

not be happy, he proceeded to talk about the Wilson case for approximately six minutes while respondent and the detective listened and took notes. Defendant called back about ten minutes later and spoke with respondent and the detective for another fifteen minutes, although he was again reminded that the public defender would be unhappy with him. At the conclusion of this call, the detective agreed to visit defendant at the jail. Although respondent's notes indicate that defendant now was focusing almost exclusively on the Wilson murder, the public defender was advised neither of the calls nor of the impending visit with her client.

The detective had been advised by respondent that because defendant was initiating the calls, the constitutionality and the voluntariness of the statements were established and that he should "let Darryl talk" but refrain from posing questions of his own. After the call to his own office and the appointment for the detective to visit personally with defendant, respondent consulted with the chief and deputy chief of the felony section, who advised him that the detective should take a partner with him to the jail and give defendant his Miranda warnings before proceeding with the interview.

While the deputy chief recalled that there may have been some discussion of the ethical proprieties of communicating directly with defendant, the chief of the felony section acknowledged in his testimony that his primary concern in advising respondent was whether the evidence would be constitutionally admissible. The deputy chief did not recollect that respondent advised either himself or the chief that he had personally spoken with defendant. It is also clear from the record that the chief's advice as to any ethical considerations was more directed at the contacts the detective was having with defendant rather than to any calls respondent might be receiving. The chief acknowledged that his understanding of the rules regarding professional responsibility would probably not have affected his advice, because he "didn't think the D.C. bar rules had much to say about how the police behaved."

On November 21, 1988, the detective and a partner visited with defendant at the jail and

gave Miranda warnings, but defendant refused to sign the form because, he said, it would make his lawyer angry. The meeting was terminated.

On November 25 or 26, 1988, respondent received four more collect calls from defendant from the jail, all of which he accepted. He reminded defendant that his attorney had already complained to the court about his contacts with representatives of the government but permitted defendant to continue to speak with him nonetheless. Respondent asked no questions but listened to everything defendant had to say. While his notes again indicate that defendant was now speaking only of the Wilson murder, respondent did not advise defendant's attorney of these calls.

Defendant was indicted for the murder of Wilson on December 8, 1988. The public defender subsequently sought to have defendant's statements to respondent and the detective suppressed and/or the indictment dismissed on the basis of prosecutorial misconduct. The motion was denied by written order dated July 10, 1989, but the judge referred the matter of respondent's possible violation of DR 7–104 of the Code of Professional Responsibility[2] to the District of Columbia Board of Professional Responsibility.

The Board of Professional Responsibility for the District of Columbia at that time had disciplinary jurisdiction over any attorney who engaged in the practice of law in the District of Columbia on a *pro hac vice* basis, but in 1988 the relevant rule did not apply to an AUSA practicing pursuant to 28 USC § 517. For this reason, the case was referred to the office of New Mexico's disciplinary counsel in May 1990.

Rule 16–805, NMRA subjects a lawyer admitted to practice in New Mexico to the disciplinary authority of this Court, even though he or she may be engaged in practice elsewhere. Both respondent and his employer, the United States Department of Justice (DOJ), filed federal suits challenging this Court's jurisdiction to conduct this disciplinary proceeding. Both suits were resolved in favor of this court's jurisdiction. *See In re Doe*, 801 F.Supp. 478 (D.C.N.M.1992) and *United States v. Ferrara*, 847 F.Supp. 964 (D.C.D.C.1993), *aff'd* 54 F.3d 825 (App.D.C. 1995). These opinions have discussed some, but not all, of the legal principles we now address.

The hearing committee and the disciplinary board concluded that respondent had violated Rule 16–402 by directly communicating about the subject of the representation with a party he knew to be represented by another lawyer in the matter without the consent of the other lawyer and without authorization of law to do so. The committee and the board panel also concluded that respondent had violated Rule 16–804(A) by knowingly communicating with defendant through the detective and by knowingly assisting and inducing the detective to communicate with defendant.

The issues raised by respondent in his appeal are (a) whether he was entitled to rely on the advice of his supervisor and thus should be excused for any violation of Rule 16–402 under the provisions of Rule 16–502(B); (b) whether he "communicated" with defendant within the meaning of Rule 16–402; (c) whether any communication that occurred was "authorized by law;" (d) whether his actions were authorized under federal Constitutional principles that override New Mexico's Rules of Professional Conduct; and (e) whether, even if a violation occurred, disciplinary action should be taken against him.

---

**2.** At all relevant times, Rule 7–104(A)(1) of the Code of Professional Responsibility in the District of Columbia read as follows:

"During the course of his representation of a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing the other party or is authorized by law to do so."

At all relevant times, Rule 16–402 of the Rules of Professional Conduct in New Mexico read as follows:

"In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so ..."

The prohibitions contained in the Rules are essentially identical.

## DISCUSSION

### I. The applicability of Rule 16–502(B) to respondent's actions.

 Respondent first argues that New Mexico's Rule 16–502(B) should control the resolution of this case. This rule states that "a subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty." It is respondent's contention that he was a "subordinate lawyer" within the meaning of this rule and that, as such, he was not only entitled but also obligated to rely upon the advice given to him by the chief and deputy chief of the felony section with respect to the calls generated by defendant. Consequently, he asserts, his actions must be excused. Respondent's position fails for several reasons.

First of all, Rule 16–502(B) must be read in connection with Rule 16–502(A), which directs that "a lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person." The ABA Comment to Model Rule 5.2 makes it clear that the rule, taken as a whole, is not meant to immunize attorneys from accountability for their misconduct.[3]

Respondent has cited no cases, and we are aware of none, which hold for the proposition that an attorney may be exonerated from the consequences of his or her misconduct simply on the basis that the unethical acts were committed upon another's instructions or authorization. The few reported cases on this topic uphold the theory that an attorney is always answerable for his or her own actions. As one court has noted:

> When others are involved in misconduct with counsel, degrees of culpability may vary, but ultimate responsibility does not. Counsel simply cannot delegate to others their own duty to act responsibly ... [in] the end, each member of the bar is an officer of the court. His or her first duty is not to the client or the senior partner, but to the administration of justice.

*Roberts v. Lyons,* 131 F.R.D. 75, 84 (E.D.Pa. 1990) citing *Coburn Optical Indus., Inc. v. Cilco,* 610 F.Supp. 656, 661 (M.D.N.C.1985); *see also McCurdy v. Kansas Dep't of Transp.,* 21 Kan.App.2d 262, 898 P.2d 650, 652 (1995) ("[A] lawyer is not relieved of his or her responsibility for a violation of the rules of professional conduct just because he or she acted at the direction of a supervisor," citing the Comment to Rule 5.2).

 Even more compelling, however, is that in this instance there was no "arguable question of professional duty" needing resolution. Respondent has argued that various memoranda generated in-house at the Department of Justice prior to his actions took the position that federal prosecutors are not bound by state disciplinary rules prohibiting communication with represented persons and has submitted these documents as exhibits to the record. We are not persuaded that an attorney's employer, even though that employer may be an attorney or an arm of the United States government, can create an "arguable question of professional duty" within the meaning of Rule 16–502(B) by the simple mechanism of unilaterally declaring that a particular rule of conduct is burdensome and should not apply to its employees.

In further support of his position that such an arguable question exists, respondent has cited numerous articles on the subject of whether or not federal prosecutors should be bound by state ethical rules. While we recognize that a debate currently rages regarding the applicability of ABA Model Rule 4.2 to federal prosecutors, all of the articles cited by respondent were published between 1990 and 1996 and were no doubt occasioned in part by former Attorney General Richard Thornburgh's *Memorandum* of June 8, 1989, which discussed the applicability of Rule 4.2 to federal prosecutors and which itself was issued after respondent's acts of misconduct. Respondent's duty to refrain from communicating with a represented criminal defendant is not subject to argument. According to the ABA Comment to Model Rule 5.2, if a ques-

---

3. The ABA Comment begins with the admonition that "although a lawyer is not relieved of responsibility for a violation by the fact that the lawyer acted at the direction of a supervisor, that fact may be relevant in determining whether a lawyer had the knowledge required to render conduct a violation of the Rules."

tion of ethical duty can be answered in only one way, "the duty of both lawyers is clear and they are equally responsible for fulfilling it."

Even if one were to accept the premise that an arguable question of professional duty with respect to Rule 16–402 existed in November 1988, it is apparent from the record of these proceedings that the discussions respondent had with the chief of the felony section regarding defendant's calls bore only a tangential relationship to respondent's ethical duties. The chief testified under oath that his "primary concern as a supervisor was whether the evidence was constitutionally admissible" and that he "would have focused on the constitutional issues involved in contacts between a defendant and a law enforcement representative; that is, I would have been focusing on his Fifth Amendment right to be silent, his Sixth Amendment right to counsel." Additionally, it is not clear from the testimony of the chief and deputy chief that they were even aware that respondent himself was communicating with defendant. Clearly respondent was not seeking advice as to his ethical obligations to defendant and to the public defender; any passing consideration of these duties which may have arisen was secondary to the primary question of how to obtain admissible evidence from defendant.

Rule 16–502 cannot and does not excuse respondent's conduct.

## II. Whether respondent "communicated" with defendant within the meaning of Rule 16–402.

Respondent next disputes the hearing committee's conclusion that a lawyer "communicates" with a represented party when he willingly listens to what that person has to say. He argues that he did not violate Rule 16–402 because the evidence in the case shows that he simply listened to defendant. Since there was no questioning of defendant, he reasons, he did not "communicate" with defendant. We disagree.

While certainly one purpose of Rule 16–402 is to prevent attorneys from utilizing their legal skills to gain an advantage over an unsophisticated lay person, an equally important purpose is to protect a person represented by counsel "not only from the approaches of his adversary's lawyer, but from the folly of his own well-meaning initiatives and the generally unfortunate consequences of his ignorance." *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 459 (1979) (quoting Justice Levin's dissent).

The law and Rule 16–402 also recognize that once an attorney has been retained or appointed to represent a litigant, that attorney's responsibility is to act on behalf of the client and to protect the client from compromising his or her case by inadvertently waiving a viable defense or from disclosing privileged information. The attorney cannot fulfill this responsibility when opposing counsel freely comes into contact with the client without the attorney's knowledge.

By not contacting defendant's attorney and by encouraging defendant to talk to him and to the detective without her advice, respondent violated Rule 16–402 and the principles behind it.

> The principle is not so much, important as that is, to preserve the civilized decencies, but to protect the individual, often ignorant and uneducated, and always in fear, when faced with the coercive police power of the State. The right to the continued advice of a lawyer, already retained or assigned, is his real protection against an abuse of power by the organized State. It is more important than the preinterrogation warnings given to defendants in custody. These warnings often provide only a feeble opportunity to obtain a lawyer, because the suspect or accused is required to determine his need, unadvised by anyone who has his interests at heart. The danger is not only the risk of unwise waivers of the privilege against self-incrimination and of the right to counsel, but the more significant risk of inaccurate, sometimes false, and inevitably incomplete descriptions of the events described.

*People v. Hobson*, 39 N.Y.2d 479, 485, 384 N.Y.S.2d 419, 423, 348 N.E.2d 894, 899 (1976).

To argue that one does not violate Rule 16–402 if one does not ask questions or im-

part information borders on sophistry. People do not compromise their positions or waive their defenses by listening to an attorney; they do so by talking while the attorney listens.

"Communication" and "interrogation" are not synonymous, and it is "communication" that is prohibited by Rule 16–402. One can communicate interest and concern simply by indicating a willingness to listen. Since criminal defendants who are in custody often attempt to seek out and explain themselves to persons in authority under the generally misguided notion that they can extricate themselves from an unfortunate situation, the apparent willingness of a detective and a prosecutor to consider a defendant's version of the facts can be a particularly compelling message. "The influence of the prosecutor's presence is immeasurable." *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 456 (quoting Justice Moody, concurring in part and dissenting in part). Respondent and the detective were well aware that defendant was attempting to discuss the evidence in his own case in order to help himself and they used his false hope to their advantage. Even if they asked no questions of defendant, by granting him an audience they tacitly encouraged him to keep talking.

While a lack of overreaching by a prosecutor in this situation may be a mitigating factor, it does not excuse compliance with the standard prescribed by Rule 16–402. In *People v. Green*, the prosecutor merely listened to and took notes on the statement of a murder suspect (at the suspect's request) and, at the end of the statement, simply asked the man whether he had been telling the whole truth. Although the statement was found to be voluntary, the attorney's violation of Rule 7–104(A)(1) was recognized by the court. A similar violation of the rule occurred in *Suarez v. State*, 481 So.2d 1201 (Fla.1985), where the prosecuting attorney "did little except listen to what the defendant had to say and take notes." *Id.* at 1206 (quoting *Green*, 274 N.W.2d at 454–455).

We therefore reject respondent's argument that an attorney does not violate Rule 16–104 unless he or she is an active participant in a conversation with a represented opponent regarding the subject matter of the representation.

## III. Whether respondent communications were "authorized by law" within the meaning of Rule 16–402.

Respondent next contends that even if he is found to have "communicated" with defendant, there is no violation of Rule 16–402 because any communication he might have had was "authorized by law." In support of this position, he asserts that his conduct would have been authorized under case law, under other states' interpretations of their disciplinary rules, and/or under statutes delegating to the Attorney General the responsibility for conducting criminal investigations and prosecutions (and the interpretations the DOJ has placed on these statutes.)

The cases cited by respondent in support of his first theory do little to bolster his position, as the cases concern the issue of whether statements made to a prosecutor by a represented defendant should be suppressed rather than the issue of whether the prosecutor violated the ethical prohibition against contact with a represented party. As an example, respondent places great reliance on the decision of the District of Columbia Court of Appeals in *United States v. Rorie*, 518 A.2d 409 (D.C.App.1986), a case in which the chief of the felony section had personally participated. In *Rorie*, the appellate court overturned the trial court's exclusion of unsolicited statements made to a detective by a represented criminal defendant. The decision is based upon a Sixth Amendment analysis of the facts and makes no mention whatsoever of rules governing attorney ethical conduct.

Additionally, many of the suppression decisions relied upon by respondent involve non-custodial, pre-charging contacts with represented criminal defendants. Respondent cites *United States v. Ryans*, 903 F.2d 731 (10th Cir.), *cert. denied*, 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990), for the proposition that federal courts have declined to hold that otherwise legitimate law enforcement communications with represented persons violate ethical obligations. In *Ryans*, however, the Tenth Circuit noted that the

rule against unauthorized contact would apply when one has been "charged, arrested or indicted or otherwise 'faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" 903 F.2d at 740 (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 [1972]). The Court explained that "when the government's role shifts from investigation to accusation, however, then the balance of the interests at stake shifts. Clearly, if adversary proceedings had begun here, this would be a different case." *Id.* In the present case, at the time of respondent's communications with defendant, defendant had been arrested, a preliminary hearing had been held, probable cause had been found, and defendant was in custody being held without bond.

Respondent's reliance upon the holdings in suppression decisions as justification for his conduct is misplaced, as these cases generally do not define an attorney's ethical responsibilities. If they mention disciplinary rules at all, it is primarily to make clear that the rules are not ordinarily available to a criminal defendant in fashioning a personal remedy for himself or herself. As recently noted by the Ninth Circuit Court of Appeals in reversing a lower court's dismissal of an indictment because of a prosecutor's unauthorized contact with a represented defendant:

> We are sensitive to the district court's concerns that none of the alternative sanctions available to it are as certain to impress the government with our resoluteness in holding prosecutors to the ethical standards which regulate the profession as a whole. At the same time, we are confident that, when there is no showing of substantial prejudice to the defendant, lesser sanctions, such as holding the prosecutor in contempt or referral to the state bar for disciplinary proceedings, can be adequate to discipline and punish government attorneys who attempt to circumvent the standards of their profession.

*United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir.1993) (citations omitted).

■ Respondent has chosen to ignore the body of case law which has held that even where an attorney's actions do not violate constitutional standards, they may still be in violation of Rule 7–104(A) and/or Rule 16–402. The exclusionary rule is available to courts when a defendant's constitutional rights have been trampled, but many courts have recognized that the public would be ill-served if the misconduct of an individual attorney permitted an otherwise guilty person to go free. A reversal of a defendant's conviction for a prosecutor's violation of Rule 7–104(A)(1) "would constitute reprehensible 'overkill,'" and "bar disciplinary action directed against the offending attorney would be a more appropriate response and would serve as a more effective deterrent than the indirect sanction of the exclusionary rule." *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 454–455; *see also United States v. Partin*, 601 F.2d 1000 (9th Cir.1979); *United States v. Dennis*, 843 F.2d 652 (2d Cir.1988).

■ We disagree with respondent's argument that his communications with the defendant should be deemed authorized pursuant to comments to disciplinary rules in other jurisdictions, most of which were not even in effect at the time of his misconduct. We particularly reject the suggestion that his actions should be viewed in light of a Comment to the District of Columbia's Rule 7–104 adopted in 1991 (three years *after* his misconduct,) given the fact that early in these proceedings he objected strenuously to disciplinary counsel's having charged him with a violation of that rule as well as ours and successfully argued to the hearing committee that the Board and this Court had no authority to enforce District of Columbia's rules and that those particular allegations against him should be dismissed. He now claims to have acted in accordance with the District of Columbia's rule and the 1991 Comment thereto.

Had the Comment to the District of Columbia's rule been in effect in 1988, respondent's argument might have some merit under our Rule 16–805. This rule states that a New Mexico attorney is subject to this Court's disciplinary authority even though engaged in practice elsewhere but recognizes that "if the rules of professional conduct in the two jurisdictions differ, principles of con-

flict of laws may apply." Since even respondent admits in his brief that the District of Columbia's rule and New Mexico's rule were "identical in all pertinent respects" in 1988, however, we need not address this argument.

■ Respondent's third purported justification for the position that his communications were "authorized by law" is that Congress has authorized the Attorney General to direct and supervise the conduct of DOJ prosecutors and that he acted in compliance with DOJ policies. We question whether 28 USC §§ 516, 515(a), 533 and 547 empower the Attorney General and/or the DOJ to adopt policies that are inconsistent with an attorney's ethical responsibilities. Consequently, we are not persuaded that those policies rise to the level of "law" within the meaning of Rule 16–402.

For regulations issued by an agency to have the force of law, they must be promulgated pursuant to statutory authority. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1717–1718, 60 L.Ed.2d 208 (1979). While the grant of authority need not be specific, a reviewing court must "reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* at 308, 99 S.Ct. at 1721. We cannot reasonably conclude that the general enabling statutes cited by respondent authorize the DOJ to issue policies or regulations that absolve its attorneys from the responsibility to comply with ethical regulations promulgated by the courts granting them their licenses and responsible for their conduct as officers of the court.

As noted by one court:

The Department of Justice Appropriation Authorization Act ("DOJ Act") requires all attorneys in the Department of Justice to "be duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia." *See* Pub.L. No. 96–132, 93 Stat. 1040, 1044 (1979) (appropriations for fiscal year 1980); *see also* Pub.L. No. 102–395, 106 Stat. 1828, 1838, § 102(a) (1992) (appropriations for fiscal year 1993, reenacting provisions of Pub.L. 96–132). To be "duly licensed and authorized to practice as an attorney," a member of a state bar must of necessity comply with that state's code of professional responsibility. Congress therefore clearly contemplated compliance with state bar ethical standards by attorneys practicing in the Department of Justice.

*United States v. Ferrara*, 847 F.Supp. 964, 969 (D.C.D.C.1993), *aff'd* 54 F.3d 825 (App. D.C.1995); *see also United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 961 F.Supp. 1288, 1293–1294 (E.D.Mo.1997) (general enabling statutes do not authorize DOJ to issue regulations exempting its attorneys from requirements of state ethical rules) and *U.S. v. Lopez*, 4 F.3d 1455, 1461 (9th Cir. 1993) (enabling statutes neither expressly nor impliedly authorize contacts with represented individuals.)

Under none of the theories advanced by respondent can it be said that his communications with defendant fell within the "authorized by law" exception to Rule 16–402.

## IV. Whether the Supremacy Clause of the United States Constitution precludes our enforcement of New Mexico's Rules of Professional Conduct in this instance.

■ Respondent next raises as a defense the same Supremacy Clause argument that has been decided adversely to him and his employer (DOJ) by two other courts of competent jurisdiction. *See In re Doe* and *U.S. v. Ferrara*. While we recognize that these decisions are not binding on this Court, in view of our holding that respondent was not authorized by any federal law to undertake the actions which he did, we choose to follow the reasoning of Judges Burciaga and Johnson in those cases and reject as well the argument that the Supremacy Clause bars us from regulating respondent's conduct.

At the outset of his argument, respondent claims that as a federal official he "cannot be punished for actions within his official duty." We remind respondent that our purpose in disciplining attorneys for violating our Rules of Professional Conduct is not the punishment of the attorney but "the protection of the public, the profession, and the administration of justice." *Preface*, Rules Governing

Discipline, NMRA 17–101 to 17–316 NMRA. Our duty to ensure that the safety of the public, the reputation of the profession, and the orderly administration of justice are not undermined by the actions of an attorney licensed by this Court should in no way interfere with respondent's duty to see that the laws of the United States are "faithfully executed." As noted by Judge Burciaga:

> Certainly, if permitted to act unethically any attorney could gain advantage over his or her adversary. But to prevail in litigation by unfair means not only rewards the unscrupulous but relegates justice to a hollow victory. This is exactly what the codes of ethics is designed to prevent ... "the United States wins its case whenever justice is done one of its citizens in the courts."

*In re Doe,* 801 F.Supp. at 488–489 (quoting from an inscription on the rotunda wall in Washington, D.C.).

The conflict between our ethical rules and respondent's federal responsibility to investigate and prosecute violations of the law, essential to a Supremacy Clause defense, is simply not present in this instance. Such a conflict arises if "compliance with both federal and state regulations is a physical impossibility" or where the state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County v. Automated Med. Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). Respondent has not cited and cannot point to any federal law which requires him to carry out his duties as an AUSA in an unethical manner or to any intent of Congress that he even be permitted to do so.

To the contrary, the intent of Congress still appears to be that respondent and others in his position should adhere to the ethical standards prescribed by their licensing courts. In 1990, the House Subcommittee on Government Information, Justice, and Agriculture conducted hearings on the innovative efforts by the DOJ to exclude its attorneys from the obligation to abide by state ethical rules. The Subcommittee concluded in its report:

> We disagree with the Attorney General's attempts to exempt departmental attorneys from compliance with the requirements adopted by the State bars to which they belong and in the rules before the Federal courts before which they appear ... we are not persuaded of a need to exempt Departmental attorneys from Model Rule 4.2 as adopted by State bars and Federal Courts.

*Federal Prosecutorial Authority in a Changing Legal Environment: More Attention Required,* H.R.Rep. No. 986, 101st Cong., 2d. Sess. at 32 (1990).

While Congress unquestionably has the authority to preempt state regulations if it chooses to do so, it clearly has yet to manifest such an intent with respect to Rule 16–402. Respondent's Supremacy Clause defense therefore must fail.

### V. Appropriate Sanction.

Finally, respondent asserts that even if we reject his other arguments and find that he has in fact violated our Rules of Professional Conduct, which we have done, he should not be disciplined for his offenses (a) because he "was simply caught in a dispute between the federal government and the state bar associations" and (b) because the conduct at issue could not recur, as the DOJ has promulgated a new policy which will henceforth govern contacts between AUSAs and represented defendants. *See* 28 C.F.R. Part 77.

We have noted that there was no extant controversy with respect to Rule 16–402 at the time of respondent's actions. The fact that former Attorney General Richard Thornburgh and his successors at the DOJ were part of and continued to engage in such a dispute does not excuse respondent's conduct. While the question of whether 28 C.F.R. Part 77 will control future contacts between DOJ attorneys and represented defendants is not before us, we note that within the past few months at least one court has rejected this most recent effort by the DOJ to exempt its attorney employees from the requirements of Model Rule 4.2 and related rules. *See United States ex rel. O'Keefe v. McDonnell Douglas Corp.,* 961 F.Supp. 1288

(E.D.Mo.1997). Thus it remains to be seen whether this latest DOJ "regulation" resolves this issue.

The ABA *Standards for Imposing Lawyer Sanction* (Standard 3.0) suggest that the following factors should be considered in determining what sanction should be imposed after a finding of attorney misconduct: (1) the duty violated; (2) the lawyer's mental state; (3) the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors.

The duty violated in this instance involves an attorney's duty to the legal system not to communicate improperly with those who are represented by other attorneys, one of the most elementary premises of the adversary system. Respondent had inappropriate contacts with the defendant directly on at least six (6) separate occasions and on numerous other occasions through an intermediary (the detective). Although defendant initiated the contacts, respondent's repeated willingness to accept defendant's calls and his statement in open court (after defendant's attorney had objected to contacts between defendant and the detective outside of her presence) to the effect that "If he [defendant] wants to call us, we will take his call" indicate that he encouraged and perpetuated the communications and that his actions were intentional rather than the result of negligence or ignorance.

There is no evidence that the contacts resulted in actual injury to either defendant or the legal process in general. The potential for injury, however, is obvious. As Judge Burciaga observed:

> When a government lawyer, with enormous resources at his or her disposal, abuses this power and ignores ethical standards, he or she not only undermines the public trust, but inflicts damage beyond calculation to our system of justice. This alone compels the responsible and ethical exercise of this power.

*In re Doe,* 801 F.Supp. at 480.

While the fact that respondent does not have a prior disciplinary record may be considered as a mitigating factor (ABA Standard 9.32[a]), there are several factors in aggravation of his misconduct. Most notable is the fact that he refuses to this day to accept or even recognize the wrongful nature of his conduct. (ABA Standard 9.22[g]). When asked at one point whether, if put in the same position again he would do the same thing, respondent replied in the negative. His answer, however, appears to have been based more upon his annoyance at having become the subject of disciplinary charges than upon any remorse for his actions, as he went on to say:

> I would never put myself in a position again to be a guinea pig, a test case, whether or not [the chief of the felony section] gave me the right directions, whether or not the Attorney General or the Thornburgh Memorandum, whether or not the District of Columbia Court of Appeals two years later said what happened was—if it was constitutional, it was proper. I would never again put myself in a position where so many authorities would second-guess what I thought I had done reasonably and within the bounds of my professional responsibilities.

Respondent then proceeded to remove any remaining doubt about whether or not he acknowledges that his actions were improper:

> [W]hen you asked me if I would ever do this again, my answer was not to say that what I did then was wrong. I believe I was ethical and proper under those circumstances. And I would, given the same circumstances today, without any other changes, if this happened again, I would do the same thing. I wouldn't change.

We believe respondent's comments indicate a lack of appreciation for the importance of the duty at issue. We are not persuaded that he "was simply caught in a dispute."

A second aggravating factor is that at the time of this incident, respondent had substantial experience in the practice of law. (ABA Standard 9.22[i]). He had graduated from the University of Virginia School of Law in 1978 and had clerked for two Federal judges before joining the U.S. Attorney's Office in 1984. Both the hearing committee and the disciplinary board found that at the time of these actions respondent was "an accomplished, seasoned, and sophisticated attorney." His violations of Rules 16–402 and

16–804(A) were due neither to ignorance nor incompetence.

The ABA *Standards* suggest that (absent aggravating or mitigating circumstances) "[r]eprimand is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system, and causes injury or potential injury to a party or interference or potential interference with the outcome of a legal proceeding." *ABA Standards for Imposing Lawyer Sanction* (Standard 6.33).

Standard 2.5 notes that "reprimand" is "also known as censure or public censure" and defines it as "a form of public discipline which declares the conduct of the lawyer improper, but does not limit the lawyer's right to practice." The "Commentary" to Standard 2.5 points out that this sanction "emphasizes the concern of the court with all lawyer misconduct" and "serves the useful purpose of identifying lawyers who have violated ethical standards and, if accompanied by a published opinion, educates members of the bar as to those standards."

We hope that members of the New Mexico bar already appreciate the importance of their professional obligations under Rules 16–402 and 16–804(A) NMRA. We trust that for most, if not all, New Mexico lawyers, this opinion discusses no new legal principle. Nonetheless, this opinion will serve to affirm that our rules apply to all New Mexico lawyers, wherever they practice, and that we intend to continue to enforce our rules.

**IT IS THEREFORE ORDERED** that G. Paul Howes be, and he hereby is, publicly censured pursuant to Rule 17–206(A)(4) NMRA for his numerous and intentional violations of Rules 16–402 and 16–804(A).

**IT IS FURTHER ORDERED** that Howes shall reimburse the disciplinary board the costs of this disciplinary proceeding in the amount of $8,663.52 on or before **November 19, 1997,** with interest accruing thereafter on any balance due at a rate of 8¾% per annum. Additionally, Howes is assessed the board's costs and attorney fees on appeal in an amount to be determined by this Court after reviewing a statement of fees and costs on appeal to be submitted by disciplinary counsel on or before **June 19, 1997.** All costs assessed in this matter shall be reduced to a transcript of judgment.

**IT IS SO ORDERED.**

McKINNON, J., not participating.

