# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J. Fisher, Jr.                                    Elisabeth A. Shumaker
Clerk                                                     Chief Deputy Clerk

January 13, 1999


**TO:**   ALL RECIPIENTS OF THE OPINION

**RE:**   97-3178, *United States v. Singleton*
          Filed on January 8, 1999

In the dissent filed with the opinion, on page 17, line 5, the penultimate paragraph, the word "paying" should read "playing".

A copy of the corrected page 17 is attached for your convenience.

                              Sincerely,
                              Patrick Fisher, Clerk of Court


                              Keith Nelson
                              Deputy Clerk




encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 8 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

SONYA EVETTE SINGLETON,

        Defendant-Appellant.

\----------------------------------------------------

NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,

        Amicus Curiae.

No. 97-3178

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 96-10054-05)**

---

John V. Wachtel, Klenda, Mitchell, Austerman & Zuercher L.L.C., Wichita, Kansas, for Defendant-Appellant.

Michael Dreeben, U.S. Department of Justice (James K. Robinson, Assistant Attorney General Criminal Division; Jackie N. Williams, United States Attorney; Michael G. Christensen, Assistant United States Attorney, Wichita, Kansas; Sean Connelly, U.S. Department of Justice, Denver, Colorado, with him on the briefs), Washington, D.C., for Plaintiff-Appellee.

Robert S. Mahler, MacDonald, Hoague & Bayless (Timothy K. Ford, MacDonald, Hoague & Bayless, Seattle, Washington; Norman R. Mueller and Rachel A. Bellis, Haddon, Morgan & Foreman, P.C., Denver, Colorado; David M. Porter, Co-Chair, NACDL Amicus Committee, Office of the Federal Defender, Eastern District of California, Sacramento, California, with him on the briefs), Seattle, Washington, for Amicus Curiae.

Before **SEYMOUR**, Chief Judge; **PORFILIO, ANDERSON, TACHA, BALDOCK,
BRORBY, EBEL, KELLY, HENRY, BRISCOE, LUCERO,** and **MURPHY**, Circuit
Judges.

---

**PORFILIO**, Circuit Judge.

---

Sonya Singleton was convicted of money laundering and conspiring to distribute

cocaine. A panel of this court reversed that conviction on the ground the prosecuting

attorney violated 18 U.S.C. § 201(c)(2) when he offered leniency to a co-defendant in

exchange for truthful testimony. The panel held the testimony of the co-defendant should

have been suppressed and that the failure to do so was not harmless error. ***United States

v. Singleton***, 144 F.3d 1343 (10th Cir. 1998). The en banc court vacated the panel

decision, ***id.*** at 1361, and has now reheard the appeal. We now hold 18 U.S.C.

§ 201(c)(2) does not apply to the United States or an Assistant United States Attorney

functioning within the official scope of the office.

## I

The conspiracy forming the basis of Ms. Singleton's conviction required her to

send and receive drug proceeds by Western Union wires. Her co-conspirator Napoleon

Douglas entered into a plea agreement in which he agreed to testify truthfully in return for

the government's promise not to prosecute him for related offenses, to advise the

sentencing court of his cooperation, and to advise a state parole board of the "nature and extent" of his cooperation.

Before trial, Ms. Singleton moved to suppress the testimony of Mr. Douglas on the ground the government had violated 18 U.S.C. § 201(c)(2), the so-called "anti-gratuity statute," by promising him leniency in exchange for his testimony. The district court denied the motion and Mr. Douglas testified, acknowledging the benefits he would receive in exchange for his testimony and implicating Ms. Singleton in the charged offenses. Ms. Singleton asks us to review the court's denial of her motion.

## II

The question before us is whether section 201(c)(2) applies to the government in the prosecution of criminal offenses. Ms. Singleton argues the plain language of the statute permits no answer but that it does. As expected, the government counters such a reading is beyond the intent of Congress and clearly wrong. We review this issue of law de novo, *FDIC v. Canfield*, 967 F.2d 443, 445 (10th Cir. 1992) (en banc), and begin our analysis with the pertinent portions of the statute itself:

(c)     Whoever-

        . . . .

        (2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial . . . before any court . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(2) (1994).

Ms. Singleton takes the position that when Mr. Douglas testified after receiving the government's promise of lenient treatment in exchange for his truthful testimony, he became a "paid 'occurrence' witness," and testimony from those of such ilk is contrary to the fundamental precepts of American justice because the payment of something of value would give the witness a strong motivation to lie. She reasons section 201(c)(2) was enacted to deter that result, and we need only apply plain meaning to the word "whoever" contained in the statute to conclude it must apply broadly and encompass the government and its representatives.

In contrast, the United States argues to allow section 201(c)(2) to sweep so broadly would not only be a radical departure from the ingrained legal culture of our criminal justice system but would also result in criminalizing historic practice and established law. The government maintains Congress did not intend to hinder the sovereign's authority to prosecute violations against the United States in this fashion.

Viewing the statute on its face, it is apparent the dispute revolves about the word "whoever." Indeed, the significance of the remaining parts of the statute is not seriously controverted. However, like many words chosen by the legislative branch to convey its intent, this one word evokes more meaning than an innocent first reading of it would portend.

As correctly argued by Ms. Singleton, "whoever" is a broad term which by its ordinary definition would exclude no one. Indeed, if one were to take the word at face value, defendant's argument becomes colorable, at least. However, the defendant's approach, while facially logical, ignores a crucial point that must be considered in any attempt to apply the statute to the issues of this case. She argues the breadth of the word "'whoever' includes within its scope the assistant United States attorney who offered Douglas something of value in exchange for his testimony." To begin the parsing of the statute with this assumption, however, ignores a fundamental fact: the capacity in which the government's lawyer appears in the courts.

The prosecutor, functioning within the scope of his or her office, is not simply a lawyer advocating the government's perspective of the case. Indeed, the prosecutor's function is far more significant. Only officers of the Department of Justice or the United States Attorney can represent the United States in the prosecution of a criminal case. 28 U.S.C. §§ 516, 547 (1994); *United States v. Navarro*, 959 F. Supp. 1273, 1277 (E.D. Cal. 1997), *rev'd on other grounds*, 1998 WL 809553 (9th Cir. Nov. 24, 1998). Indeed, a federal court cannot even assert jurisdiction over a criminal case unless it is filed and prosecuted by the United States Attorney or a properly appointed assistant. *See United States v. Providence Journal Co.*, 485 U.S. 693, 699-708 (1988) (dismissing petition for certiorari for lack of jurisdiction where the petition was filed by a government lawyer acting without the authority to do so); *United States v. Durham*, 941 F.2d 886, 892 (9th

Cir. 1991) (whether Special AUSA had been properly appointed went to jurisdiction of the district court). Therefore, the government's sovereign authority to prosecute and conduct a prosecution is vested solely in the United States Attorney and his or her properly appointed assistants. Of course, it cannot be otherwise because the government of the United States is not capable of exercising its powers on its own; the government functions only through its officers and agents. We thus infer in criminal cases that an Assistant United States Attorney, acting within the scope of authority conferred upon that office, is the alter ego of the United States exercising its sovereign power of prosecution. Hence, in the attempt to apply section 201(c)(2), the United States and the Assistant United States Attorney cannot be separated. Indeed, the alter ego role[1] of the prosecutor is not unusual, for in a similar case, the Sixth Circuit has noted:

> When an assistant United States Attorney (AUSA) enters into a plea agreement with a defendant, that plea agreement is between the United States government and the defendant. When an AUSA uses at trial testimony obtained through a plea agreement or an agreement not to prosecute, he does so as the government. An AUSA who, pursuant to the provisions of the United States Sentencing Guidelines, moves for a downward departure under § 5K1.1, does so as the government.

*United States v. Ware*, 161 F.3d 414, 1998 WL 830587, *8 (6th Cir. Dec. 3, 1998).

---

[1]The concurrence finds some oddity in our reference to a United States Attorney as both the alter ego of the government and a governmental agent. There is no disparity in the two concepts because the United States Attorney has duties other than prosecution. Therefore, when prosecuting a criminal matter in the name of the United States, he is the government, but when performing another duty of his office, he is an officer or agent of the government.

Put into proper context, then, the defendant's argument is: in a criminal prosecution, the word "whoever" in the statute includes within its scope the United States acting in its sovereign capacity. Extending that premise to its logical conclusion, the defendant implies Congress must have intended to subject the United States to the provisions of section 201(c)(2), and, consequently, like any other violator, to criminal prosecution. Reduced to this logical conclusion, the basic argument of the defendant is patently absurd.

There is even a more fundamental reason for arriving at the same conclusion, however. Although Congress may, by legislative act, add to or redefine the meaning of any word, it did not do so in the passage of section 201(c)(2). Therefore, we must presume it intended to employ the common meaning of the word. The word "whoever" connotes a being. *See* **Webster's Third New International Dictionary** 2611 (1993) (defining "whoever" as "whatever *person*: any *person*" (emphasis added)). The United States is an inanimate entity, not a being. The word "whatever" is used commonly to refer to an inanimate object. *See id.* at 2600 (defining "whatever" as "any*thing* that: every*thing* that" (emphasis added)). Therefore, construing "whoever" to include the government is semantically anomalous. Looking beyond definitions, though, there are rules of statutory construction that will lead to the same conclusion.

Statutes of general purport do not apply to the United States unless Congress makes the application clear and indisputable. In ***The Dollar Savings Bank v. United States***, 86 U.S. 227 (1873), the Court instructed:

> It is a familiar principle that the King is not bound by any act of Parliament unless he be named therein by special and particular words. The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him in the least, if they may tend to restrain or diminish any of his rights and interests. . . . The rule thus settled respecting the British Crown is equally applicable to this government, and it has been applied frequently in the different States, and practically in the Federal courts. It may be considered as settled that so much of the royal prerogatives as belonged to the King in his capacity of *parens patriae*, or universal trustee, enters as much into our political state as it does into the principles of the British constitution.

*Id.* at 239 (footnote omitted); ***see also*** 8 Matthew Bacon, **A New Abridgment of the Law** 92 (1869) ("[W]here a statute is general, and thereby (a) any prerogative, right, title, or interest is divested or taken from the king, in such case the king shall not be bound, (b) unless the statute is made by express words to extend to him."); Henry Campbell Black, **The Construction and Interpretation of the Laws** 94-97 (2d ed. 1911) (same). The Court revisited the concept in ***Nardone v. United States***, 302 U.S. 379, 383-84 (1937), when it held this canon of construction generally applies when failure to limit the application of a statute would "deprive the sovereign of a recognized or established prerogative title or interest" or "where a reading which would include [the government] would work obvious absurdity."

We have already established the absurdity in trying to apply section 201(c)(2) to the sovereign's prosecutorial powers, and a number of courts have agreed for an abundance of reasons we also find persuasive. *See, e.g., United States v. Haese,* ___ F.3d ___, 1998 WL 842185, at *8 (5th Cir. Dec. 7, 1998); *Ware*, 161 F.3d 414, 1998 WL 830587, at *9; *United States v. White*, ___ F. Supp. 2d ___, 1998 WL 758830, at *2-3 (E.D.N.C. 1998); *United States v. Hammer*, ___ F. Supp. 2d ___, 1998 WL 725211, at *17 (M.D. Pa. 1998); *United States v. Reid*, 19 F. Supp. 2d 534, 535-38 (E.D. Va. 1998); *United States v. Arana*, 18 F. Supp. 2d 715, 717-19 (E.D. Mich. 1998); *United States v. Dunlap*, 17 F. Supp. 2d 1183, 1184-88 (D. Colo. 1998); *United States v. Guillaume*, 13 F. Supp. 2d 1331, 1332-34 (S.D. Fla. 1998); *United States v. Eisenhardt,* 10 F. Supp. 2d 521, 521-22 (D. Md. 1998); *United States v. Barbaro*, 1998 WL 556152, at *3 (S.D.N.Y. Sept. 1, 1998). *But see United States v. Revis*, ___ F. Supp. 2d ___, 1998 WL 713229 (N.D. Okla. 1998); *United States v. Fraguela*, 1998 WL 560352 (E.D. La. Aug. 27, 1998).

The next question, then, is whether applying the statute to the government would deprive the sovereign of a recognized or established prerogative, title, or interest. The answer to that question is, inescapably yes.

From the common law, we have drawn a longstanding practice sanctioning the testimony of accomplices against their confederates in exchange for leniency. *See Hoffa v. United States*, 385 U.S. 293, 310-12 (1966); *Lisenba v. California,* 314 U.S. 219, 227

(1941); ***Benson v. United States***, 146 U.S. 325, 333-37 (1892); ***The Whiskey Cases***, 99 U.S. 594, 599-600 (1878). Indeed,

> [n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence.

***United States v. Cervantes-Pacheco***, 826 F.2d 310, 315 (5th Cir. 1987); ***United States v. Juncal***, 1998 WL 525800, at *1 (S.D.N.Y. Aug. 20, 1998) ("The concept of affording cooperating accomplices with leniency dates back to the common law in England and has been recognized and approved by the United States Congress, the United States Courts and the United States Sentencing Commission.").

This ingrained practice of granting lenience in exchange for testimony has created a vested sovereign prerogative in the government. It follows that if the practice can be traced to the common law, it has acquired stature akin to the special privilege of kings. However, in an American criminal prosecution, the granting of lenience is an authority that can only be exercised by the United States through its prosecutor; therefore, any reading of section 201(c)(2) that would restrict the exercise of this power is surely a diminution of sovereignty not countenanced in our jurisprudence.

Moreover, in light of the longstanding practice of leniency for testimony, we must presume if Congress had intended that section 201(c)(2) overturn this ingrained aspect of American legal culture, it would have done so in clear, unmistakable, and unarguable language.

Congress is understood to legislate against a background of common-law adjudicatory principles. Thus, where a common-law principle is well established . . . the courts may take it as a given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (citations and quotation marks omitted); *see also Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 521-22 (1989). It further follows, therefore, the absence of such language makes patent section 201(c)(2) was not intended to apply to the United States or its attorneys.

The government also points out a number of statutes and rules with which defendant's reading of section 201(c)(2) would conflict. Other courts have done so as well. *See, e.g., Arana*, 18 F. Supp. 2d at 718-19 (conflicts with 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1(a)(2)); *Dunlap*, 17 F. Supp. 2d at 1184-86 (conflicts with Fed. R. Crim. P. 11(e)); *Guillaume*, 13 F. Supp. 2d at 1334 (conflicts with 18 U.S.C. §§ 6001-05). We simply believe the general principles we have set forth so completely undercut defendant's reading that further exposition would be redundant.

## III

Our conclusion in no way permits an agent of the government to step beyond the limits of his or her office to make an offer to a witness other than one traditionally exercised by the sovereign. A prosecutor who offers something other than a concession normally granted by the government in exchange for testimony is no longer the alter ego

- 11 -

of the sovereign and is divested of the protective mantle of the government.  Thus, fears

our decision would permit improper use or abuse of prosecutorial authority simply have

no foundation.[2]  It is noteworthy, then, that defendant's premise relies upon the shibboleth

"the government is not above the law."  While we agree with that notion, we simply

believe this particular statute does not exist for the government.  Accordingly, we

**AFFIRM** the district court's denial of the motion to suppress on 18 U.S.C. § 201(c)(2)

grounds.  We adopt the ruling of the panel that the evidence in the record was sufficient

to sustain the judgment of conviction, notwithstanding the panel's conclusion the

testimony of Mr. Douglas should have been suppressed.

---

[2]The concurrence expresses a concern our disposition would "permit the conclusion that consistent with the provisions of § 201, a United States Attorney may pay a prosecution witness for false testimony."  We believe the concern is misplaced.  It is inconceivable that any court would hold that a prosecutor who pays for the *false* testimony of a witness is carrying out an official function of the government.  Our disposition protects only those prosecutorial acts of the government which have been recognized in common law or authorized by statute.  A prosecutor who goes beyond those limitations is clearly not performing a governmental function.  Moreover, a prosecutor who procures false testimony is surely subject to penalty under 18 U.S.C. § 1622.

The dissent's observation that both statutes employ the word "whoever" misses our point.  "Whoever" includes the prosecutor in § 1622 because subornation of perjury is not an official governmental function.

No. 97-3178, United States v. Sonya Evette Singleton.

**HENRY**, Circuit Judge, concurring.

This difficult case has spawned three excellent opinions. Judge Lucero's concurrence resolves the case most convincingly for me, and I join that concurrence.

I write briefly to add that this problem may arise again. As the dissent notes, Congress has recently passed legislation, sponsored by Rep. Joe McDade and endorsed by the American Bar Association and the American Corporate Counsel Association, [1] that repeals the Thornburgh memorandum. It directs that government attorneys – most of whom are licensed in the state in which they practice – be subject to state ethical rules. Thus, the dissent's suggestions as to other tactics that might be employed may deserve close scrutiny.

Further, I note that although I believe the majority is correct on the tradition argument, I do not see the statute as construed by the dissent as patently absurd. I do see that its operation as construed by the dissent would work what might be called a legal absurdity, in that Congress would have criminalized the general practice. I simply do not believe Congressional intent could have been to criminalize the widespread and common practice of government lawyers.

---

[1] See Harvey Berkman, Thornburgh Rule is Nixed, The National Law Journal, Nov. 2, 1998, at A8.

97-3178, United States of America v. Sonya Evette Singleton

**LUCERO,** J., with whom Judge **HENRY** joins, concurring.

I concur in the judgment that the United States and its agent, an Assistant United States Attorney, did not violate 18 U.S.C. § 201(c)(2) by offering in a plea agreement to exchange leniency for the testimony of Singleton's co-conspirator. See I R. doc. 109, at 1-4. [1] But I write separately to state my disagreement with the majority's holding that the word "whoever" in 18 U.S.C. § 201(c)(2), as it is used to define the class of persons who can violate the statute, cannot include the government or its agents. The majority's interpretation would

---

[1]The Singleton panel limits its analysis to "three specific promises made by the government to Mr. Douglas in return for his explicit promise to testify." Singleton v. United States, 144 F.3d 1343, 1344 (10th Cir. 1998). The second and third promises relate expressly to the government's advising sentencing bodies of the extent of Douglas's cooperation. See I R. doc. 109, at 2. It is these promises that are properly before us because the first promise—forbearance from prosecution for certain offenses—may be understood as consideration for Douglas's plea of guilty to six separate criminal counts. See id. at 1 ("In exchange for the plea of guilty . . . and the defendant's cooperation . . ., the United States agrees . . . .") (emphasis added); Fed. R. Crim. P. 11(e)(1)(A). It should be understood in this manner because, in the absence of evidence to the contrary, plea agreements—like contracts—are construed to render each term lawful. See Restatement (Second) of Contracts § 203(a) (1979) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") & id. at § 207 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.").

permit the conclusion that consistent with the provisions of § 201, a United

States Attorney [2] may pay a prosecution witness for false testimony.

I cannot join the dissent, however, because § 201(c)(2) operates in

conjunction with other statutes to allow the government, upon proper disclosure

and/or with court approval, to trade certain items of value for testimony. These

statutes include 18 U.S.C. § 3553(e) and 28 U.S.C. § 994(n), passed as part of

the Sentencing Reform Act of 1984, which allow courts, acting pursuant to the

Sentencing Guidelines and upon motion of the government, to reduce sentences

for individuals who provide "substantial assistance in the investigation or

prosecution of another"; the federal immunity statutes, 18 U.S.C. §§ 6001-6005,

passed as part of the Organized Crime Control Act of 1970, which require courts,

upon the request of the government, to confer immunity upon witnesses for their

testimony in aid of the prosecution; and the Witness Relocation and Protection

Act, 18 U.S.C. §§ 3521-3528, passed as part of the Comprehensive Crime

Control Act of 1974, which allows the government to bestow various benefits for

the protection of cooperating witnesses. Because these specific statutes are in

conflict with the general prohibitions of § 201(c)(2), the specific statutes control,

and permit the prosecution's actions in this case. Whereas the majority considers

---

[2] For purposes of this concurrence, "United States Attorney" should be read
to include Assistant United States Attorneys.

these statutes to be unnecessary to its result, see Maj. Op. at 11, I find them dispositive.

## I

It is undisputed that the Assistant United States Attorney's offer of leniency to Mr. Douglas was for his testimony. See Maj. Op. at 2; Singleton , 144 F.3d at 1344. Thus, the only issue is whether 18 U.S.C. § 201(c)(2), the anti-gratuity provision of the federal bribery statute, prohibits the prosecutor's conduct.

## A

The majority holds that "whoever" as used in § 201(c)(2) does not include the government. That result, I believe, cannot be reconciled with Nardone v. United States , 302 U.S. 379 (1937), which holds that government agents are liable under the wiretapping provisions of the Federal Communications Act. Like the statute at issue here, that under review in Nardone uses a term of general applicability—"no person"—to encompass the class of persons subject to the law. See Nardone , 302 U.S. at 380-82. The majority's conclusion that "whoever" cannot refer to the government because it "connotes a being" and not an entity, see Maj. Op. at 7 (citing dictionary definition of "whoever"), must therefore be incorrect because the statutory language that Nardone holds to include the government also connotes a being and not an entity.

-3-

Nardone identifies two classes of statutes wherein terms of general applicability do not apply to the government. "The first is where an act, if not so limited, would deprive the sovereign of a recognized or established prerogative title or interest." Nardone, 302 U.S. at 383. The second is where an interpretation of the statute to include government officers "would work obvious absurdity." Id. at 384. The majority holds that the government cannot be included within "whoever" in § 201(c)(2) because the statute falls within both these classes. I respectfully disagree.

With regard to the first class, the majority identifies "a longstanding practice sanctioning the testimony of accomplices against their confederates in exchange for leniency" as creating a vested prerogative in the government. Maj. Op. at 9. Nardone, however, limits the class of statutes under which language of general applicability excludes the government. "The rule of exclusion of the sovereign is less stringently applied where the operation of the law is upon the agents or servants of the government rather than on the sovereign itself." Nardone, 302 U.S. at 383. The majority would transform virtually all federal "officers and agents" relating to law enforcement and prosecution into alter egos of the government, thereby rendering Nardone's limitation on the prerogative of the sovereign mere surplusage. [3] In effect, the majority would overrule Nardone's

_____

[3] Although the majority infers that United States Attorneys are in fact "alter
(continued...)

-4-

holding that federal officers are liable under the wiretapping provisions of the Federal Communications Act. For purposes of Nardone, United States Attorneys must be regarded as agents of the government, not as its alter egos. [4]

With respect to the second class recognized by Nardone, the majority's holding itself works an obvious absurdity by implying that a federal prosecutor who bribes a witness to supply false testimony is not subject to the criminal prohibitions of § 201. Even the government concedes that a prosecutor who corruptly bribes a witness to provide testimony is liable under 18 U.S.C. §

---

[3](...continued)
egos" of the government, "acting within the scope of authority conferred upon that office . . . [and] exercising [the government's] sovereign power of prosecution," Maj. Op. at 6, it also characterizes United States Attorneys as "officers and agents" of the government. Id.

[4] The majority's citation of language from Dollar Savings Bank v. United States, 86 U.S. (19 Wall.) 227, 239 (1873), reaffirming the federal government's right to impose and collect taxes notwithstanding a law of general applicability, is inapposite in this context. See Maj. Op. at 8. Whereas the Constitution explicitly grants the power to tax to the federal government, see U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises . . . ."); U.S. Const. amend. XVI ("The Congress shall have power to lay and collect taxes on incomes, from whatever source derived . . . ."), it grants no such explicit right or prerogative to federal prosecutors. In addition, during the same term as it decided Dollar Savings Bank, the Court explicitly noted that the longstanding principle that the king is not subject to acts of Parliament yields where "a statute is passed . . . to prevent fraud, injury and wrong." United States v. Herron, 87 U.S. (20 Wall.) 251, 255 (1873). Section 201, which criminalizes bribery and gratuities given to public officers and witnesses, clearly falls within this exception.

201(b)(3).  See Appellee's Supp. Br. at 15.  In short, neither of  Nardone 's two exceptions  supports the majority's result.

## B

The government asserts that because the Dictionary Act defines "whoever" in a manner that does not expressly include the federal government,  see 1 U.S.C. § 1, Congress could not have intended its use of "whoever" in § 201(c)(2) to include the government and its agents. [5]  Part of the purpose of § 201, however, is to criminalize certain behavior of government officials.  See 18 U.S.C. § 201(b)(2).  In addition, as noted above, the government itself states that a prosecutor who corruptly bribes a witness to provide testimony is liable under 18 U.S.C. § 201(b)(3), which, like § 201(c)(2), merely uses the word "whoever" to identify potentially liable parties. [6]  If "whoever" can refer to government agents in one part of the statute, then it surely can refer to government agents in § 201(c)(2).

---

[5] 1 U.S.C. § 1 states in part:  "In determining the meaning of any act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."

[6] An important aspect of the government's argument in this respect is that the corrupt prosecutor is acting "ultra vires."  This is unpersuasive not only because it contradicts the statute's plain meaning, but because it would destroy the logic of the regime that Congress has created to regulate the bargaining process with, and testimony of, cooperating witnesses.  See infra, section II.

Furthermore, the structure of 18 U.S.C. § 201 indicates that "whoever" is inclusive of public officials. Sections 201(b) and (c) plainly state that "whoever" performs certain acts shall be punished under Title 18. For certain offenses, however, §§ 201(b)(2) and (c)(1)(B) limit their scope to "whoever . . . being a public official[, former public official,] or person selected to be a public official." 18 U.S.C. §§ 201(b)(2) and (c)(1)(B). The use of the limiting construction "being a public official" necessarily implies the inclusion of such officials within the catch-all term "whoever." Logically, a person falling within the scope of the construction "whoever . . . being" necessarily falls within the larger scope of "whoever"—thereby indicating that "whoever" cannot be construed to exclude those public officials. More generally, of course, §§ 201(b)(2) and (c)(1)(B) demonstrate Congress's ability to limit certain offenses under § 201 to certain classes of individuals when it wishes to do so. The choice not to so limit § 201(c)(2) carries a clear implication that is wrongly ignored by the majority.

## II

"It is an elementary tenet of statutory construction that '[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.'" Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 375 (1990) (quoting Morton v. Mancari, 417 U.S. 535, 550-51 (1974)). Rather, a

specific statute controls over the general. See Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961); see also 2B Norman J. Singer, Sutherland on Statutes and Statutory Construction § 51.05, at 174 (5th ed. 1992) ("Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized; but if there is any conflict, the latter will prevail."). This is true regardless of the priority of the individual statutes' enactment. See Bulova Watch, 365 U.S. at 758.

## A

Congress has developed an extensive and detailed statutory framework authorizing sentence reductions and recommendations, immunity, and other incentives for cooperating witnesses. Federal immunity statutes, for example, which authorize prosecutors to request immunity for cooperating witnesses, see 18 U.S.C. §§ 6001-6005, "reflect[] the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime." Kastigar v. United States, 406 U.S. 441, 446 (1972). The Supreme Court has characterized the immunity statutes as "essential to the effective enforcement of various criminal statutes," id. at 447, and "so familiar that they have become part of our 'constitutional fabric,'" United States v. Mandujano, 425 U.S. 564, 575-76 (1976) (plurality op.) (quoting Lefkowitz v. Turley, 414 U.S. 70, 81-82 (1973)).

Although, as the Singleton panel noted, the government moves the court to grant immunity rather than bestowing immunity directly upon a cooperating witness, see Singleton, 144 F.3d at 1348, the government's role in the process is more important than that of the court. See United States v. Doe, 465 U.S. 605, 616 (1984) (noting that the immunity statutes grant government authorities "exclusive authority to grant immunities" and that the courts play "only a minor role in the immunizing process"); Pillsbury Co. v. Conboy, 459 U.S. 248, 254 n.11 ("'The court's role in granting the [immunity] order is merely to find the facts on which the order is predicated.'" (quoting H.R. Rep. No. 91-1549, at 43 (1970), reprinted in 1970 U.S.C.C.A.N. 4007, 4018)). Indeed, the statutory language itself requires the court, "upon the request of the United States attorney," to "issue . . . an order requiring [a witness] to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination." 18 U.S.C. § 6003(a).

When granted statutory immunity, the potential witness is given something of value by the government in that his immunized testimony cannot be used to prosecute him. By the same token, the government plainly gains something of value from immunizing the testimony—the testimony itself. See Mandujano, 425 U.S. at 575 (characterizing immunity as "the quid pro quo for securing an answer from the witness"). The immunity statutes give the government leverage with

which to obtain testimony from recalcitrant witnesses, and the power to grant immunity serves as one of the bargaining tools in the prosecutorial process. See id. at 576 (characterizing the grant of immunity as the government's "ultimate tool for securing testimony that would otherwise be protected"); see also Jeffrey Standen, Plea Bargaining in the Shadow of the Guidelines, 81 Cal. L. Rev. 1471, 1492 (1993) (placing negotiations over immunity grants within the general framework of the plea bargaining process).

The Witness Relocation and Protection Act expressly authorizes the Attorney General to provide for the relocation and protection of certain federal witnesses. See 18 U.S.C. § 3521(a). It allows the government to provide numerous things of value, see 18 U.S.C. § 3521(b)(1)(B) & (D) (authorizing the government to provide housing and pay the basic living expenses for protected witnesses), in exchange for the agreement of the witness "to testify in and provide information to all appropriate law enforcement officials concerning all appropriate proceedings," as set forth in a "memorandum of understanding." 18 U.S.C. § 3521(d)(1) & (d)(1)(A).

Dispositive in this case is the Sentencing Reform Act of 1984, which, as amended, authorizes courts, upon motion of the government, to reduce sentences for individuals who provide "substantial assistance in the investigation or prosecution of another." See 18 U.S.C. § 3553(e) (authorizing reductions below

statutory minimum sentence); 28 U.S.C. § 994(n) (requiring the Sentencing Commission to assure that Sentencing Guidelines "reflect the general appropriateness" of such reductions); see also Fed. R. Crim. P. 35(b) (authorizing post-sentencing reductions "in accordance with the guidelines and policy statements issued by the Sentencing Commission under 28 U.S.C. § 994"). There can be little doubt that Congress intended to include the provision of cooperative testimony under the rubric of "substantial assistance." Both 18 U.S.C. § 3553(e) and 28 U.S.C. § 994(n) define such assistance in terms of "the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(3) & 28 U.S.C. § 994(n) (emphasis added). Although there are some forms of assistance in prosecution that are neither testimonial nor duplicative of investigatory assistance, it stretches credulity to suppose that Congress intended to exclude cooperative testimony from "substantial assistance" as used in these statutes. See Bridger Coal Co./Pac. Minerals v. Dir., Office of Workers' Compensation Programs, 927 F.2d 1150, 1153 (10th Cir. 1991) (citations omitted) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.").

By allowing prosecutors to reward testimony with sentencing benefits, the statutes must also be read to authorize prosecutors to inform a defendant and potential witness of the possibility of such reward. Barring a prosecutor from

-11-

discussing leniency prior to testimony would seriously inhibit the intended effect of these statutes by reducing the pool of defendants willing to testify against their co-conspirators to those informed by their counsel of the potential benefits of cooperation. Furthermore, a bar to pre-testimony negotiation would contradict the intent of Fed. R. Crim. P. 11. "Where plea discussions and agreements are viewed as proper, it is generally agreed that it is preferable that the fact of the plea agreement be disclosed in open court and its propriety be reviewed by the trial judge." Fed. R. Crim. P. 11(e) advisory committee's note to 1974 Amendment. This openness was intended to recognize plea bargaining as "an ineradicable fact," and prevent it from being "drive[n] underground," where it would otherwise "occur[] in an informal and largely invisible manner" without "effective judicial review of the propriety of the agreements, thus increasing the risk of real or apparent unfairness." Id. Consequently, construing §§ 3553(e) and 994(n) not to cover pre-testimony negotiation would contradict the very purpose of Rule 11 by eliminating its "appropriate and adequate safeguards" embodied therein. Id. Defendants would have little incentive to provide cooperative testimony, thereby frustrating Rule 11's purpose in authorizing plea bargaining as "an essential component of the administration of justice." Id. (quoting Santobello v. New York, 404 U.S. 257, 260 (1971)).

-12-

Pursuant to these grants of statutory authority, the Sentencing Commission has issued a policy statement entitled "Substantial Assistance to Authorities," see U.S.S.G. § 5K1.1, which allows a downward departure in consideration of "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant." U.S.S.G. § 5K1.1(a)(2). Courts have upheld the exchange of testimony for leniency under this authority. See, e.g. , United States v. Courtois , 131 F.3d 937, 938-39 (10th Cir. 1997) (holding that prosecution may bargain away its discretion not to file a § 5K1.1 motion) (citing Wade v. United States , 504 U.S. 181, 185 (1992)) .

In totality, these various statutes create both a substantive and procedural framework for bargaining between government agents and potential witnesses. They limit the "something of value" that the government may offer, and detail the roles of both the prosecution and the courts in determining sentences, providing immunity, and granting other forms of assistance. The result is a coherent, narrowly defined set of laws that operate in the same field as the more general prohibitions of § 201(c)(2). Under long-established principles of statutory construction, where specific statutes overlap with a general statute, the latter must give way, insofar as it would prohibit that which the narrow statutes would allow. [7] It is for this reason that I concur with the majority's result.

---

[7] Where § 201(c)(2) does give way, the requirements of constitutional due

(continued...)

-13-

**B**

This analysis has several advantages over that of the majority. It provides both a roadmap for the bargaining process and a clearly articulated criminal statute with which to punish straying prosecutors. The majority's reading of § 201(c)(2), on the other hand, creates a conceptually messy legal regime for handling the case of the errant United States Attorney "who offers something other than a concession normally granted by the government," Maj. Op. at 11, such as bribing a witness to provide false testimony.

The majority reasons that this prosecutor can be held liable because he is acting ultra vires, and is therefore "no longer the alter ego of the sovereign and is divested of the protective mantle of the government." Maj. Op. at 11-12. The majority's holding, premised on the government's sovereign authority and the common law of exchanges of testimony for leniency,     see Maj. Op. at 6, 9-10, is likely to create difficulties for authorities who, in seeking to sanction errant

---

[7](...continued)

process and confrontation, as well as the rules of criminal procedure, will continue to protect the accused. Thus, prosecutors must disclose to the defendant "evidence of any understanding or agreement . . . [that] would be relevant to [a witness's] credibility." Giglio v. United States, 405 U.S. 150, 154-55 (1972); see also Davis v. Alaska, 415 U.S. 308, 316-17 (1974) ("[T]he exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."). Additionally, the court plays an important role in reviewing plea agreements. See Fed. R. Crim. P. 11(c) (requiring court to advise defendant with respect to plea agreement); Fed. R. Crim. P. 11(d) (requiring court to insure that plea is voluntary); Fed. R. Crim. P. 11(e) (permitting court to reject plea agreement).

prosecutors, will be forced to study the arcania of the common law to discern the scope of protected prosecutorial activity. On the other hand, the statutory construction proposed here protects the general prohibition of § 201(c)(2), but provides specific exemptions that the government may follow. Prosecutors may offer only those incentives that Congress has approved, and may bargain and execute agreements only within the narrow, specific procedures that Congress and the courts have articulated. If a United States Attorney does not act within the provisions of those specific statutes that conflict with § 201, then § 201—including subsection (c)(2)—applies. Conversely, where the actions of the prosecutor fall within such provisions, as in this case, then § 201(c)(2) does not apply.

No. 97-3178, United States v. Sonya Evette Singleton.

**KELLY**, Circuit Judge, with whom **SEYMOUR**, Chief Judge, and **EBEL**, Circuit Judge, join, dissenting.


The court holds that 18 U.S.C. § 201(c)(2) does not apply to the government because government prosecutors are inseparable from the sovereign, and that its application would deprive the sovereign of its power to grant leniency in exchange for testimony and would conflict with various statutory provisions.[1]  Because courts must apply unambiguous statutes as they are written and § 201(c) does not admit of an exception for the government or its prosecutors, I respectfully dissent.

As an initial observation, since the panel issued its opinion in this case, prosecutors from coast to coast have attempted to portray it as the death knell for the criminal justice system as we know it.  These are the same grave forecasts made by prosecutors after the

---

[1]The concurring opinion incorrectly suggests that we should be concerned only with two promises made to the co-conspirator for his testimony.  The co-conspirator's plea agreement contained three specific promises in exchange for testimony: (1) forbearance of prosecution, (2) advice to the sentencing court of the co-conspirator's cooperation, and (3) the same advice to a Mississippi parole board.  See United States v. Singleton, 144 F.3d 1343, 1344 (10th Cir. 1998).  The concurring opinion suggests that the first of these promises should be interpreted as fully supported by the co-conspirator's agreement to plead guilty to six counts of an indictment. Conc. Op. at 1 n.1.  The difficulty with this interpretation is that it contradicts the express language of the plea agreement.  See I R. doc. 109 at 1, ¶ 2 ("In exchange for the plea of guilty set out in paragraph 1 and the defendant's cooperation as set forth in paragraph 3 below, the United States agrees . . . .") (emphasis added); id. at 2, ¶ 3 ("The defendant agrees, in consideration of the items listed in paragraph 2 above, as follows: a.  Defendant agrees to fully cooperate . . . .  This includes:  . . .  2.  testifying truthfully in federal grand jury proceedings, as necessary; 3.  testifying truthfully in federal and state court, as necessary;").  Plainly, all three promises by the government were made in partial consideration for the co-conspirator's testimony.

Supreme Court's decision in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and the advent of the exclusionary rule. But experience has proven that the government, just like the private citizens it regulates and prosecutes, can live within the rules. No one would suggest that the criminal justice system has ceased to function because the Court or Congress has effectuated constitutional or statutory guarantees designed to promote a more reliable outcome in criminal proceedings.

In holding that § 201(c)(2) simply does not apply to the government, the court does not hold that leniency in exchange for testimony does not constitute "anything of value." To be sure, the investigation and prosecution of criminal wrongdoing is an important societal function. Yet, largely missing from the debate since the panel opinion was issued is any concern for the other deeply held values that § 201(c) was intended to protect and which, I believe, the panel opinion honored by applying § 201(c) as Congress wrote it. Those concerns center on maintaining the integrity, fairness, and credibility of our system of criminal justice. Criminal judgments are accepted by society at large, and even by individual defendants, only because our system of justice is painstakingly fair. An additional core value honored by the panel opinion is the preservation of the separation of powers carefully articulated in the Constitution between the legislative and judicial branches, and the proper role of the judiciary as the law-interpreting, rather than lawmaking, branch of the federal government.

Contrary to the concerns expressed by some commentators and courts, see United States v. Ware, 161 F.3d 414, 1998 WL 830587 (6th Cir. Dec. 3, 1998), a straight-forward interpretation of § 201(c), which encompasses a prohibition against the government buying witness testimony with leniency, actually aids the search for truth. In theory, the leniency is only in exchange for "truthful" testimony. See United States v. Haese, No. 97-10307, 1998 WL 842185, at *8 (5th Cir. Dec. 7, 1998). But as the Supreme Court has recognized: "Common sense would suggest that [an accused accomplice] often has a greater interest in lying in favor of the prosecution rather than against it, especially if he is still awaiting his own trial or sentencing. To think that criminals will lie to save their fellows but not to obtain favors from the prosecution for themselves is indeed to clothe the criminal class with more nobility than one might expect to find in the public at large." Washington v. Texas, 388 U.S. 14, 22-23 (1967); see also Yvette A. Beeman, Note, Accomplice Testimony Under Contingent Plea Agreements, 72 Cornell L. Rev. 800, 802 (1987) ("Accomplice plea agreements tend to produce unreliable testimony because they create an incentive for the accomplice to shift blame to the defendant or other co-conspirators. Further, an accomplice may wish to please the prosecutor to ensure lenient prosecution in his own case."). To be sure, there are devices that partially ameliorate the problem. The government is required to disclose exculpatory information, including impeachment information, to a defendant. Testifying accomplices may be cross-examined. Their credibility may be impeached, and the jury is instructed

that it may regard such testimony with caution.   However, all of these devices have limitations.  In the real world of trial and uncertain proof, and in view of § 201(c), a witness's demeanor and actual testimony are simply too important to hinge upon promises of leniency.   Although the court notes that a prosecutor who procures false testimony could be prosecuted for subornation of perjury, 18 U.S.C. § 1622,[2] such a remedy offers little practical advantage to a defendant facing trial.  By barring an exchange of leniency for testimony, Congress in § 201(c) has sought to eliminate, <u>at the source</u>, the most obvious incentive for false testimony.

On the other side of the ledger is my concern for the institutional role of Article III courts.  Much of this case has been about policy.  I accept the government's position that accomplices can provide important information and interpreting § 201(c) to include prosecutors might require some changes to elicit testimony of some witnesses.  While it would be up to the Department of Justice to devise ways of compliance, the government is not precluded from offering leniency in exchange for information and assistance short of actual testimony at trial.  Likewise, the government could prosecute accomplices first, then compel their testimony by subpoena against co-conspirators.[3]  Finally, the

---

[2]Like § 201(c)(2), the subornation of perjury statute applies to "[w]hoever," and makes no exception for federal prosecutors.

[3]One way prosecutors could obtain information and assistance short of actual testimony at trial is to enter into a plea agreement with a defendant under Fed. R. Crim. P. 11(e).  Section 201(c) does not prohibit Rule 11(e) plea agreements in which the defendant pleads in exchange for <u>information</u> helpful to the prosecution if the plea

(continued...)

government could request that the district court order an accomplice to testify under a grant of immunity. Surely the Department has the ability and resources to come up with effective and lawful means for procuring necessary accomplice testimony. However, I also accept the defense attorneys' position that government leniency in exchange for testimony can create a powerful incentive to lie and derail the truth-seeking purpose of the criminal justice system. The very nature and complexity of this policy debate reinforces my initial belief that this is an argument better left to Congress. This court must perform its constitutional duties and no more. Ours is not to explore the farthest meanings that the term "whoever" can bear so as to effectuate the policy we think best. Our duty is to interpret the plain meaning of the statute. I continue to believe that meaning is clear: § 201(c), as written, applies to prosecutors and criminal defendants alike. If the balance struck by § 201 is to be reweighed, that reweighing should be done by the policymaking branch of government – the Congress, and not the courts. In that

---

[3](...continued)
agreement is not conditioned on the defendant testifying. However, the prosecutor could record the plea discussions to preserve the information provided by the defendant. After the defendant enters his guilty plea and is sentenced, the prosecutor could subpoena him as a witness in a trial of the other participants in the crime. If the defendant testified contrary to the statements he made during the plea negotiations, the government could impeach him with the record of his prior statements. See United States v. Mezzanatto, 513 U.S. 196 (1995) (upholding waiver of exclusionary provisions of Rule 11(e)). It is important to note that the defendant's trial testimony in this situation is compelled through subpoena, and is not given in exchange for anything of value.

Such a practice protects every legitimate prosecutorial concern expressed in this case by the government and refutes its contention that the criminal justice system would be crippled if it could not offer leniency to a defendant in exchange for testimony.

regard, it bears repeating that the panel's original opinion was purely a matter of statutory construction, not constitutional analysis, and it remains completely open for Congress to reweigh the conflicting values sought to be addressed in § 201.[4]

## I. "Whoever" Means Whoever

The government argues that construing the word "whoever" to include the government is semantically anomalous because "whoever" connotes a being. As a textual and contextual matter, this is wrong. Textually, "whoever" clearly connotes more than a being and in fact denotes inanimate entities. The Dictionary Act, 1 U.S.C. § 1, definition of "whoever" includes, but is not limited to, corporations, companies, associations, firms, partnerships, societies, and joint stock companies—all inanimate entities. Contextually, the government concedes that "whoever" in § 201(b) applies to the government and it acknowledges that § 201(c) applies to the government if the government pays an informant

---

[4]The panel's interpretation of § 201(c)(2) would not be retroactive. In Teague v. Lane, 489 U.S. 288 (1989), the Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," id. at 310, unless the new rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," or could be considered a "watershed rule[] of criminal procedure," the observance of which is "implicit in the concept of ordered liberty." Id. at 311 (internal citations and quotations omitted). Teague does not apply to the statutory construction of a substantive criminal statute, and therefore, there would be no retroactivity under Teague. See Bousley v. United States, 118 S. Ct. 1604, 1610 (1998).

Although the remedy of exclusion of evidence based upon a statutory violation arguably constitutes a non-constitutional rule of criminal procedure, see Amicus NACDL Br. at 15-19, such a rule also would not appear to come within Teague or its exceptions to finality. Although the concerns of comity are not present when a federal court reviews federal convictions, the concern with finality apparent in Teague is no less important. Cf. 28 U.S.C. § 2255 (one-year limitation period applicable to § 2255 motions).

money to testify.  It makes absolutely no sense to give "whoever" one meaning in § 201(b) (and in § 201(c) when the inducement offered by the government is money) and to give the very same word a completely different meaning in § 201(c) when the inducement offered is leniency or some other promise to improve the informant's position.  After all, § 201(c) is a prophylactic rule to enforce § 201(b).   "The interrelationship and close proximity of these provisions of the statute presents a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'"  Commissioner v. Lundy, 516 U.S. 235, 250 (1996) (internal quotations and citations omitted).   Bought testimony is so fraught with the potential for perjury that Congress imposed a blanket prohibition that also applies to the government, just as hearsay testimony is so fraught with the potential for unreliability that the Federal Rules of Evidence generally prohibit its admission, whether offered by the government or private litigants.

The court suggests that the prosecutor and the sovereign are inseparable, and therefore the word "whoever" cannot apply because the United States cannot be prosecuted for providing leniency in exchange for testimony.  First and foremost, "the law in this social order is not self-executing--the necessary instrument is the lawyer."  Matter of Doe, 801 F. Supp. 478, 479 (D.N.M. 1992).  To suggest that government attorneys performing prosecutorial functions are beyond scrutiny because of who they represent is anomalous because it merges attorney and client.  No one would suggest that an accused

and his attorney are one in the same for purposes of compliance with constitutional, statutory and ethical norms. As discussed below, constraints on government prosecutors are not unusual, notwithstanding that the sovereign is the client. Merely because the government cannot be prosecuted if its agents violate a rule does not mean that the rule may be disregarded; to the contrary, the rule may be enforced by means other than prosecution, here by exclusion of evidence. See Nardone v. United States, 302 U.S. 379, 384-85 (1937). The remedy of exclusion serves as a deterrent, protects a court's integrity and allows a federal court the only means it has to enforce federal law.

Recently, Congress enacted a statute that explicitly subjects government attorneys, including federal prosecutors, to State laws and rules governing attorneys. See Omnibus Appropriations Act, Pub. L. No. 105-277, tit. VIII, § 801, 112 Stat. 2681, ___, (1998) (to be codified at 28 U.S.C. § 530B(a) & (c)) (eff. April 1999); 28 C.F.R. § 77.2(a) (1998). This statute strongly suggests that the Congress does not view government attorneys as one with the sovereign, beyond regulation. It is indeed odd that federal prosecutors will soon be expressly subject to State laws and rules regarding professional conduct, yet may continue to ignore the federal prohibition contained in § 201(c)(2).

Beyond the government's sui generis definition of "whoever," the government's argument rests upon the predicate that the government has the sovereign authority to prosecute criminal conduct, and applying § 201(c) to the government would impermissibly curtail that prerogative. However, applying § 201(c) to the government does not affect the

core prerogative to prosecute or to withhold prosecution. The government erroneously conflates two distinct concepts: the vested sovereign prerogative of the government to prosecute and the obvious non-prerogative of how to prosecute. Prohibiting the government from granting witnesses leniency in exchange for testimony leaves the right to prosecute unfettered; the government can still prosecute anybody it wants and charge any way it wants. The anti-gratuity statute only limits how the government may prosecute its case and the government clearly has no vested sovereign prerogative to prove a case in any way it wishes. How the government proves its case is frequently restricted. Federal prosecutors must follow the Constitution, state codes of conduct, the rules of the individual courts, and the rules of evidence. See 28 U.S.C. § 530B(a); United States v. Mitcheltree, 940 F.2d 1329, 1341 & n.13 (10th Cir. 1991). Even the statute at issue in Nardone banned prosecutors from using evidence (including vital evidence) in a criminal trial that was obtained by a federal officer tapping telephone wires, notwithstanding that suppression was not a statutory remedy.

Thus, the anti-gratuity statute leaves unfettered the sovereign's established prerogative to charge; it merely places a restriction on one method of gathering admissible evidence, here testimony, for or against an accused. A federal prosecutor is not above the law and is not free to prove a case by any process he or she wants. See Matter of Doe, 801 F. Supp. at 484-87; In re Howes, 940 P.2d 159, 164-65 (N.M. 1997). Once the government falls into the crucible of the trial, the government, like the defendant, must

follow the generally applicable rules governing the process. The government's argument that discontinuing the pervasive practice of buying testimony for leniency would jeopardize law enforcement is just another way of saying that the end justifies the means; not only is such a premise unsound policy, it also serves to demean the profession and all who strive to continue our system of justice as the fairest in the world.

## II. Section 201(c)(2) in Relation to Other Statutes

Contrary to the government's contentions, the defendant's reading of § 201(c)(2) can be reconciled with 18 U.S.C. § 3553(e)[5]; 28 U.S.C. § 994(n)[6]; Fed. R. Crim. P. 35(b)[7];

---

[5]18 U.S.C. § 3553(e) provides:
Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

[6]28 U.S.C. § 994(n) provides:
The Commission shall assure that the guidelines reflect the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.

[7]Fed. R. Crim. P. 35(b) provides:
The court, on motion of the Government . . . , may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person who has committed an offense, in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States

(continued...)

and U.S.S.G. § 5K1.1(a)(2)[8].  It has been argued that this collection of enactments demonstrates Congress' sanction of the practice of offering various forms of leniency to a defendant in exchange for the defendant's agreement to testify in the government's prosecution of other individuals.  See United States v. Arana, 18 F. Supp.2d 715, 718-19 (E.D. Mich. 1998); United States v. Guillaume, 13 F. Supp.2d 1331, 1333-34 (S.D. Fla. 1998).

First, the statutory language we do have in § 201(c)(2) is a better guide to legislative intent than the silence about leniency in exchange for testimony contained in these other enactments.  Second, it would be pure speculation to assume that Congress intended to endorse existing practice.  As noted in the panel opinion, nowhere in 18 U.S.C. § 3553(e), 28 U.S.C. § 994(n), or Fed. R. Crim. P. 35(b) is "substantial assistance" defined to include testimony.  The conspicuous absence of the word "testimony" from any of these sources would indicate that "substantial assistance" simply does not include testimony–a

---

[7](...continued)
Code.

[8]U.S.S.G. § 5K1.1(a)(2) provides:
Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.
      (a) The appropriate reduction shall be determined by the court
      for reasons stated that may include, but are not limited to,
      consideration of the following:
            (2) the truthfulness, completeness, and
            reliability of any information or testimony
            provided by the defendant.

conclusion that avoids any conflict between these provisions and § 201(c)(2). In contrast, U.S.S.G. § 5K1.1(a)(2) does permit a court to consider "the truthfulness, completeness, and reliability of any information or testimony provided by the defendant" in deciding whether to depart from the guideline range in sentencing a defendant who has "provided substantial assistance" to the government. Even so, the fact that "substantial assistance" encompasses a defendant's testimony still does not place § 5K1.1 in conflict with § 201(c)(2). Given the duty to reconcile seemingly conflicting statutes whenever possible, see Chemical Weapons Working Group, Inc. v. Department of the Army, 111 F.3d 1485, 1490 (10th Cir. 1997), it appears that § 5K1.1 creates a narrow exception to § 201(c)(2) by permitting a court to reward a defendant's truthful testimony after it has been given. This narrow exception does not affect § 201(c)(2)'s prohibition against the prosecutor offering or promising leniency in advance to a defendant in exchange for his agreement to testify.

Likewise, the defendant's reading of § 201(c)(2) can be harmonized with 18 U.S.C. §§ 6001-6005, the statutes dealing with federal immunity. Under these statutes, where an individual has refused to testify on the basis of his Fifth Amendment privilege against self-incrimination, and where, in the judgment of the federal prosecuting attorney, the testimony may be necessary to the public interest, the prosecutor may, with approval of the Attorney General, request the district court to order that individual to testify under a grant of immunity. These statutes allow the government to compel an unwilling witness to cooperate by precluding use of the Fifth Amendment privilege. This function is entirely

-12-

distinct from promising or offering leniency ex ante in exchange for a defendant's testimony, so the prohibition expressed in § 201(c)(2) does not conflict with the grant of immunity authorized by the §§ 6001-6005. Sections 6000-6005 provide a mechanism to take away from a defendant a right he otherwise would have – the right not to incriminate himself. Constitutionally, the only way that right can be taken from a defendant is by offering immunity in exchange. Thus, the quid pro quo there is an exchange of immunity for a person's Fifth Amendment privilege. Once that exchange is made, the government can compel the witness to testify even against his wishes. That is very different, both conceptually and in terms of the risks presented, from purchasing voluntary testimony with leniency.

Finally, the defendant's reading of § 201(c)(2) does not conflict with the Witness Relocation and Protection Act, 18 U.S.C. §§ 3521(b)(1), (d)(1)(A) (authorizing the Attorney General to provide housing, living expenses and protection for a witness upon the witness' agreement to testify), or with Fed. R. Crim. P. 11(e)(1) (permitting plea agreements). Section 3521 is primarily concerned with the welfare of the witness, not with obtaining testimony. Rule 11(e) does not concern a defendant's testimony—it simply permits a defendant to bypass trial; at most, it allows a defendant to be rewarded for admitting his guilt through the dismissal of additional charges or the recommendation of a more lenient sentence.

III. Tradition

The government relies on the common law practice of sanctioning the testimony of accomplices against their confederates in exchange for leniency.  Apparently, this practice has not always been an unquestioned part of the common law.  The seventeenth century English common law scholar and judge, Sir Matthew Hale, reasoned:

> If a reward be promised to a person for giving his evidence before he gives it, this, if proved disables his testimony.
> And so for my own part I have always thought, that if a person have a promise of a pardon if he give evidence against one of his own confederates, this disables his testimony, if it be proved upon him.[9]

II Sir Matthew Hale, The History of Pleas of the Crown 280 (Sollom Emlyn ed. 1736) (footnote omitted).  A narrow focus on this practice, however, ignores two other equally compelling traditions: the common law prohibition against paying fact witnesses, and the fundamental policy of ensuring a level playing field between the government and defendant in a criminal case.

Under the common law in most jurisdictions, "it is improper to pay an occurrence witness any fee for testifying."  Model Rules of Professional Conduct  Rule 3.4 cmt. [3]; cf. 2 Wigmore, Evidence in Trials at Common Law § 520 (Chadbourn rev. 1979) (noting that conviction of suppression of testimony by bribery, a crime of infamy, has been adjudged to render individual incompetent to testify).  "Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like."

---

[9]Sir Matthew Hale acknowledged that "the contrary opinion hath prevailed."  II History of Pleas of the Crown 280 n.(c).

-14-

Model Rules Rule 3.4 cmt. [1].  The prohibition against improperly influencing witnesses is also expressed in the law of contracts, which invalidates agreements to pay fact witnesses on grounds of public policy and for lack of consideration, see Hamilton v. General Motors Corp., 490 F.2d 223, 227-28 (7th Cir. 1973) (citations omitted); 7 Richard A. Lord, Williston on Contracts § 15:6 (4th ed. 1997);  Restatement (Second) of Contracts § 73 cmt. b (1981); 6A Arthur Linton Corbin, Corbin on Contracts § 1430 (1962); Restatement of Contracts § 552(1) (1932), as well as in ethical rules which bar an attorney from offering a witness compensation or other illegal inducements to testify -- even for truthful testimony, see, e.g., Model Rules of Professional Conduct Rule 3.4(b) (1996); Model Code of Professional Responsibility DR 7-109(C) (1981).[10]

Congress has expressed its desire that government attorneys comply with state and local federal court rules governing the practice of law.  See 28 U.S.C. § 530B(a).  These ethical norms not only protect the individual, but also our system of justice within a democracy.  In the words of the late Judge Burciaga:

> [W]e must understand ethical standards are not merely a guide for the lawyer's conduct, but are an integral part of the administration of justice. Recognizing a Government lawyer's role as a shepherd of justice, we must

---

[10]The Model Code provides that "[a] lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a [fact] witness contingent upon the content of his testimony or the outcome of the case."  Model Code of Professional Responsibility DR 7-109(C) (1981).   It also suggests that "[w]itnesses should always testify truthfully and should be free of any financial inducements that might tempt them to do otherwise" and that "in no event should a lawyer pay or agree to pay a contingent fee to any witness." Id. at EC 7-28.  This rule is well served by an interpretation of § 201(c)(2) that prohibits payment of compensation in the form of leniency.

not forget that the authority of the Government lawyer does not arise from any *right* of the Government, but from *power* entrusted to the Government. When a Government lawyer, with enormous resources at his or her disposal, abuses this power and ignores ethical standards, he or she not only undermines the public trust, but inflicts damage beyond calculation to our system of justice. This alone compels the responsible and ethical exercise of power.

Matter of Doe, 801 F. Supp. at 479-80.

Constitutional law manifests another vital legal tradition which the government's position undercuts—the policy of ensuring a level playing field between the government and defendant in a criminal case. The Supreme Court long ago recognized that impartiality in criminal cases requires that "[b]etween [the accused] and the state the scales are to be evenly held." Hayes v. Missouri, 120 U.S. 68, 70 (1887). Such a policy dates back to the Bill of Rights, which was "designed to level the playing field between the defendant and the state," Susan Bandes, Empathy, Narrative, and Victim Impact Statements, 63 U. Chi. L. Rev. 361, 402 (1996), and indeed the policy has animated landmark constitutional decisions, see, e.g., Brady v. Maryland, 373 U.S. 83, 87 (1963) (stating that "[s]ociety wins not only when the guilty are convicted but when criminals trials are fair"); Miranda, 384 U.S. at 460 (stating that privilege against self-incrimination is required, inter alia, "[t]o maintain a fair state-individual balance") (citation and internal quotations omitted). Simply put, ours is an adversarial legal system, and implicit in this system, which pits the government against the defendant in a court of law, is the notion of

fair play.  See Barbara A. Babcock, Fair Play: Evidence Favorable to an Accused and Effective Assistance of Counsel, 34 Stan. L. Rev. 1133, 1138 (1982).

Remaining faithful to the important common law prohibition against paying fact witnesses and the fundamental policy of ensuring a level playing field between the government and defendant requires applying § 201(c)(2) to the government as its plain language suggests.

For the above reasons, I respectfully dissent.  A more detailed explanation of my position has been set forth in the original panel opinion in this case.  See United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998).