FILED
**United States Court of Appeals**
**Tenth Circuit**

**May 14, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ORLIN MIZAEL GARCIA,

    Defendant-Appellant.

No. 06-4288
(D.Ct. No. 2:05-CR-280-DAK)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **TACHA**, Circuit Judge, and **ANDERSON** and **BRORBY**, Senior Circuit
Judges.

_____

    After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

    Appellant Orlin Mizael Garcia pled guilty to one count of possession of

---

    [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). He now appeals his 210-month sentence, contending the district court erred in applying a two-level enhancement for his alleged management role in the offense under United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") § 3B1.1(c). We exercise jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291 and affirm Mr. Garcia's sentence.

## I. Factual and Procedural Background

On March 14, 2005, a Utah Highway Patrol officer initiated a traffic stop of Mr. Garcia, who possessed a California driver's license but told the officer he worked in Des Moines, Iowa, and was driving a friend's vehicle, a green Ford Focus, back to Iowa. Eventually, Mr. Garcia consented to a search of the vehicle, where the officer discovered 1,636.9 grams, or 1.64 kilograms, of methamphetamine in a tire in the trunk of the vehicle.

Following his indictment, Mr. Garcia pled guilty to possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Prior to sentencing, a probation officer prepared a presentence report calculating Mr. Garcia's base offense level at 38 and reducing it two levels for a safety valve reduction and three levels for acceptance of responsibility, for a total offense level of 33. A total offense level of 33, together with a criminal history

category of I, resulted in an advisory Guidelines range of 135 to 168 months imprisonment.  *See* U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

The government objected to application of the two-level safety valve reduction, contending evidence showed Mr. Garcia was a "leader/organizer" in a drug trafficking organization in Des Moines, Iowa, and providing additional discovery evidence in support of its objection.  Based on this information, the probation officer amended the presentence report by removing the two-level safety valve reduction, resulting in a total offense level of 35, for an advisory Guidelines range of 168 to 210 months imprisonment, and leaving the decision on whether to apply the safety valve reduction to the district court.

Following its objection to the safety valve reduction, the government advised the district court it intended to seek a two-level upward departure under U.S.S.G. § 3B1.1 for Mr. Garcia's role as a leader, organizer, or supervisor in the criminal activity involving the methamphetamine for which he was charged.  At the sentencing hearing, the government presented the testimony of Drug Enforcement Administration Special Agent Lonny Namanny who testified as to his experience and specialized training in drug trafficking organizations.  He also testified as to his involvement in the investigation of the Des Moines drug trafficking operation involving Mr. Garcia, as well as his review of numerous

reports detailing that investigation, his interviews with each of the law enforcement officers who prepared those reports, and his and other law enforcement officers' interviews with cooperating participants in the drug trafficking organization.

To begin, Special Agent Namanny testified as to his interview of the law enforcement officer who interviewed Gerrardo Valdovinos – a participant in the Des Moines drug organization – as well as his own review of that officer's report. In the officer's report and interview, Mr. Valdovinos admitted he trafficked methamphetamine and in August 2002 went with two other individuals, Carlos Gutierez and Jaime Lopez, to Omaha, Nebraska, where they met with Mr. Garcia, who rented hotel rooms for the purpose of their meeting. At that meeting, Mr. Gutierez and Mr. Lopez paid Mr. Garcia $25,000 to $30,000 for a previous shipment of methamphetamine. Mr. Garcia also indicated he was waiting for others to deliver money to him at the hotel and told Mr. Valdovinos he could also supply him with methamphetamine but specified all deliveries would be made in Des Moines where Mr. Gutierez would act as the middleman for those deliveries. Within ten days, Mr. Gutierez and Mr. Lopez obtained eleven pounds of methamphetamine from Mr. Garcia, of which three pounds were earmarked for Mr. Valdovinos, who later met with Mr. Garcia in Des Moines and made a partial payment of between $15,000 and $20,000.

Initially, as instructed by Mr. Garcia, Mr. Valdovinos received methamphetamine from Mr. Gutierez, but made payments to Mr. Garcia. Eventually, Mr. Valdovinos arranged to make his cash payments to and pick up of methamphetamine shipments directly from Mr. Garcia every three weeks at various locations in Des Moines or Omaha. Mr. Valdovinos indicated he obtained pure methamphetamine from Mr. Garcia which he then resold.[1] At the time of his interview, Mr. Valdovinos had in his possession a piece of paper listing a southern California telephone number for "Primo," which he admitted was Mr. Garcia's telephone number. He also correctly identified Mr. Lopez, Mr. Gutierez, and Mr. Garcia from photographs.

Special Agent Namanny also testified regarding Mr. Garcia's Utah arrest in the instant offense. During a search of the vehicle, officers not only found methamphetamine in the spare tire, but also discovered three cell phones, including one with an Iowa area code and two with southern California area codes; one cell phone contained the phone number for another drug organization participant, Marin Chevez, in its phone book application. Special Agent

---

[1] According to the presentence report, Mr. Valdovinos admitted to purchasing a total of thirty to forty pounds of pure methamphetamine from Mr. Garcia from August 2002 to February 2003, which "they" cut with MSM and converted into sixty to ninety pounds of methamphetamine for street distribution. Nothing in the record on appeal indicates who cut the methamphetamine with Mr. Valdovinos.

Namanny obtained information showing the green Ford Focus Mr. Garcia was driving at the time of his arrest had been the subject of surveillance a month earlier when authorities observed Mr. Chevez apparently using it to make a methamphetamine delivery.[2]

Following Mr. Garcia's March 2005 arrest for the instant offense and release on bail, agents placed a GPS tracking device in another green vehicle – a Honda – they suspected was being used in the drug trafficking activity under investigation. The tracking device showed the Honda left Long Beach, California, and headed westbound to Memphis, Tennessee; at that time, Agent Namanny contacted the Memphis police and requested a stop in order to identify the occupants, who turned out to be Mr. Garcia as the driver, who provided a California driver's license, and Elber Alexander-Espinoza as a passenger. After the vehicle left Memphis, the tracking device showed it traveled to a suburb of Kansas City, Missouri, and then returned to Memphis, where it was stopped again; this time, Mr. Alexander-Espinoza was the only occupant. The tracking device then showed the Honda returned to Long Beach, which correlated with information later obtained from Mr. Chevez that he and his girlfriend traveled with Mr. Garcia to Long Beach at the same time to pick up five pounds of methamphetamine.

---

[2] The vehicle was registered in the name of "Arturo Rodriguez."

On April 19, 2005, Mr. Chevez was arrested in Des Moines after driving the same green Honda from Long Beach, as confirmed by the GPS tracking device; he admitted possessing the five pounds of methamphetamine found in the vehicle, which he indicated he and Mr. Garcia had picked up in Long Beach. Special Agent Namanny interviewed Mr. Chevez's girlfriend while another agent interviewed Mr. Chevez. Later, Special Agent Namanny interviewed that officer and reviewed his report showing Mr. Chevez told him the green Honda was provided by "Primo" from California, that he had been instructed by "Primo" to drive to Des Moines, and that "Primo" would fly in from California to pick up the car. Subsequently, Mr. Chevez admitted Mr. Garcia had given him the green Honda and he was involved in a conspiracy to distribute methamphetamine with Mr. Garcia, which included the five pounds of methamphetamine in his possession. During an interview conducted by Special Agent Namanny, Mr. Chevez also identified Mr. Garcia as "Primo" and again stated Mr. Garcia gave him the car he drove to Des Moines.

In May 2005, Long Beach authorities made a traffic stop and again arrested Mr. Garcia on a warrant in conjunction with the instant offense. Evidence obtained from that vehicle included a receipt from a Los Angeles store in Mr. Garcia's name listing his address as Long Beach, California, and showing a $5,800 purchase of a Motorola repeater and five portable Motorola hand-held

radios. Later, Special Agent Namanny contacted the store and learned the radios were used for "covering a substantial distance in communication"; he testified that based on his training and experience such radios were commonly used to communicate in drug trafficking. During the same May 2005 traffic stop, Long Beach authorities also discovered a one-way airline ticket in Mr. Garcia's name for travel from Long Beach through Phoenix to Des Moines. Subsequent interviews with Mr. Valdovinos and another organization participant, MelanVerjer-Flores, established that "Primo," or Mr. Garcia, often flew to Des Moines to pick up money and then traveled back to California in a vehicle with the money.

On August 1, 2006, and October 4, 2006, Special Agent Namanny conducted interviews with Mr. Verjer-Flores, a participant in the same drug trafficking organization. Mr. Verjer-Flores first stated Mr. Chevez was "Primo," and then later recanted and said Mr. Garcia was "Primo," identified him in a photo, and stated he personally observed Mr. Garcia deliver pound quantities of methamphetamine to two individuals in Des Moines at Mr. Chevez's house, and that those individuals paid Mr. Garcia cash for the delivery.

Special Agent Namanny testified that, based on his training and experience, the large amounts of cash and methamphetamine Mr. Garcia trafficked in were

-8-

indicative of a drug trafficking organization. He also testified, based on information from the investigation, including statements of the cooperating participants and independent corroboration, that he believed Mr. Garcia was a manager in the organization, as evidenced by his residing in California but managing individuals in Des Moines, Iowa, who were actually distributing the methamphetamine he was supplying, and also based on the fact he was in Des Moines on a frequent basis to collect the proceeds from those sales.

During Special Agent Namanny's testimony, Mr. Garcia's counsel made a continuing objection concerning the admissibility of his double or multiple hearsay statements to support the two-level enhancement for Mr. Garcia's role in the drug trafficking organization. The district court recognized those objections and overruled them. At the conclusion of the sentencing hearing, Mr. Garcia's counsel conceded that the court could consider such hearsay evidence if it had a "minimum indicia of reliability," but argued there was "insufficient evidence presented to ... justify ... the two-level increase ...." Apt. App. at 110-11, 114. The court rejected Mr. Garcia's argument and imposed a two-level enhancement for Mr. Garcia's role in the offense, stating:

> [O]bviously, I'm somewhat troubled by the double hearsay, but the
> volume of evidence is fairly compelling ... the government has
> proven by a preponderance, that the defendant did direct others; Mr.
> Valdovinos, Mr. Gutierez, Mr. Chevez, and that his movement and
> activity here do suggest a management role in the trafficking

operation in terms of drugs and money.

Apt. App. at 117.  The two-level enhancement under U.S.S.G. § 3B1.1 resulted in a total offense level of 37, which, together with the criminal history category of I, resulted in an advisory Guidelines range of 210 to 262 months imprisonment.  *See* U.S.S.G. Chap. 5, Pt. A (Sentencing Table).  The district court then sentenced Mr. Garcia at the low end of the Guidelines range to 210 months imprisonment.

## II.  Discussion

On appeal, Mr. Garcia argues the district court erred in applying the two-level enhancement under U.S.S.G.§ 3B1.1(c) for his alleged management role in the offense because:  (1) it failed to make specific and detailed findings to support the enhancement; and (2) the testimony on which it based the enhancement was unreliable.  In support of his unreliable evidence argument, he claims none of Special Agent Namanny's testimony was based on personal knowledge but, instead, on summarized reports and interviews with other law enforcement officials who conducted interviews with others and that the information provided was not sufficiently corroborated by other evidence.  In regard to the lack of corroborating evidence, Mr. Garcia suggests the fact Mr. Valdovinos had Mr. Garcia's California phone number and allegedly identified him in a photo was not enough to corroborate either any drug deal or the incriminating evidence obtained during his interview.  Similarly, Mr. Garcia suggests nothing confirms it was him

driving the Honda in Memphis instead of another person using his name as an alias or that the Honda being driven to Memphis had anything to do with drugs. He also points out Mr. Verjer-Flores initially identified Mr. Chevez as "Primo" before he identified Mr. Garcia as "Primo," and contends it is significant Mr. Verjer-Flores paid Mr. Garcia for the drugs while at Mr. Chevez's house in Des Moines. He also suggests Mr. Chevez may be the manager trying to "pin" the manager/supervisor role on Mr. Garcia, rather than himself, given he received a reduced sentence for his admission in conspiring to traffic drugs with Mr. Garcia. While his argument implicates the procedural reasonableness of his sentence, he does not challenge the substantive reasonableness of his sentence.

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), we review sentences for reasonableness. *See United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006). "Our appellate review for reasonableness includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence." *United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008). Regarding the former, a sentence is not reasonable if the method by which it was determined was unreasonable or, in other words, if it was based on an improper determination of the applicable Guidelines range. *See Kristl*, 437 F.3d at 1055. In determining whether the district court correctly

-11-

calculated the recommended Guidelines range through application of the Guidelines, we review de novo the district court's legal conclusions and any factual findings for clear error, giving due deference to the district court's application of the Guidelines to the facts. *See United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006).

With these standards of review in mind, we turn to the principles relevant in applying U.S.S.G. § 3B1.1 to Mr. Garcia's sentence. Section 3B1.1(c) provides for a two-level increase in the defendant's offense level "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity ...." U.S.S.G. § 3B1.1(c). "According to the Guidelines commentary, '[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.'" *United States v. Pena-Hermosillo*, ___ F.3d ___, ___ , 2008 WL 1723664, at *4 (10th Cir. Apr. 15, 2008) (slip op.) (relying on U.S.S.G. § 3B1.1, cmt. 2). Thus, the supervisor or manager prong of § 3B1.1(c) suggests an element of control over others and therefore "applies to a defendant who exercised some degree of control or organizational authority over someone subordinate to him in the drug distribution scheme." *United States v. Valdez-Arieta*, 127 F.3d 1267, 1271 (10th Cir. 1997) (quotation marks and citations omitted). In turn, "[w]e have held ... the defendant's supervisory or managerial status is not sufficiently proved by

indicating a mere buyer/seller relationship between the defendant and the alleged group or network participants." *United States v. Reid*, 911 F.2d 1456, 1465 (10th Cir. 1990) (quotation marks and citation omitted), *overruled on other grounds by United States v. Cruz Camacho*, 137 F.3d 1220, 1224 n.3 (10th Cir. 1998).

When the government seeks to increase a defendant's sentence under § 3B1.1, as it did here, it bears the burden of proving by a preponderance of the evidence the increase is justified. *See United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir. 1995). Because the Federal Rules of Evidence do not apply at sentencing hearings, we have long held hearsay statements may be used at sentencing so long as they possess some "minimum indicia of reliability." *United States v. Browning*, 61 F.3d 752, 754-55 (10th Cir. 1995). Corroborating evidence is a means of establishing the necessary indicia of reliability of out-of-court hearsay statements presented at sentencing. *See United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir. 1993). In applying a management or supervisor role enhancement, we have made it clear "[a] district court must make specific findings and advance a factual basis to support an enhancement under U.S.S.G. § 3B1.1." *United States v. Chisum*, 502 F.3d 1237, 1242 (10th Cir. 2007) (quotation marks and citation omitted), *cert. denied*, 128 S. Ct. 1290 (2008). Our appellate review should not be hindered by a district court's failure to articulate specific findings to support its decision which results in "the absence of a clear

-13-

picture of the reasoning employed" and leaving us to "flounder in the zone of speculation." *United States v. Pelliere*, 57 F.3d 936, 940 (10th Cir. 1995).

We begin with Mr. Garcia's claim the district court failed to make sufficiently specific and detailed findings to support the enhancement. In support, Mr. Garcia relies heavily on our decision in *Pelliere* where the district court determined three individuals' statements that the defendant was second in command were sufficient to find he occupied a managerial or supervisory role, even though other witnesses testified that another individual was second in command. 57 F.3d at 943. We remanded, holding the district court's failure to articulate specific findings to support its decision "hindered" our appellate review, leaving us to "flounder in the zone of speculation.'" *Id.* at 940.

Admittedly, in this case, the district court's reasoning for applying the § 3B1.1 enhancement for Mr. Garcia's management role was brief, but it explicitly stated, in part, that the government had proven by a preponderance that Mr. Garcia directed Mr. Chevez. In regard to Mr. Chevez, it is not difficult to ascertain the facts on which the district court relied. Mr. Chevez's account was that (1) he was involved in a conspiracy with Mr. Garcia, (2) whom he verified was "Primo," (3) to distribute methamphetamine, including the five pounds of methamphetamine they obtained together in Long Beach found in the green

-14-

Honda Mr. Chevez was driving at the time of his arrest, which (4) Mr. Garcia provided him, and (5) instructed him to use to transport the methamphetamine to Des Moines, where (6) Mr. Garcia would fly to obtain the car from him. As a result, although the district court's reasoning was brief, our review has not been hindered by such brevity nor are we left to "flounder in the zone of speculation." Mr. Chevez's account sufficiently establishes Mr. Garcia had control or organizational authority over him for the purpose of warranting the two-level managerial role enhancement under § 3B1.1.[3]

As to the other participants the district court determined were controlled by Mr. Garcia – namely, Mr. Gutierez and Mr. Valdovinos – it is less clear what evidence the district court relied on. While the record establishes Mr. Garcia provided them and others with pound quantities of methamphetamine for which he received payment, those sales alone do not necessarily establish the required

---

[3] Contrary to Mr. Garcia's contention, the fact Mr. Chevez received a lesser sentence following his account of the drug trafficking organization, and, in particular, Mr. Garcia's role therein, does not inherently render his statements inadmissible, unreliable, or otherwise non-credible. *See United States v. Singleton*, 165 F.3d 1297, 1301 (10th Cir. 1999) (*en banc*) (relying on proposition that "no practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence"). It is evident from a review of the record the district court was aware Mr. Chevez was a cooperating participant who benefitted from providing information about Mr. Garcia and the drug trafficking organization, and it nonetheless found his account, as corroborated by other evidence, reliable for the purpose of applying the managerial role enhancement.

control or organizational authority over a subordinate in the drug distribution scheme. *See Valdez-Arieta*, 127 F.3d at 1271. In addition, while the evidence suggests Mr. Gutierez may have initially acted as a middleman between Mr. Garcia and Mr. Valdovinos for the purpose of selling Mr. Valdovinos methamphetamine, without further explanation we cannot readily ascertain the facts the district court relied on in determining Mr. Garcia exercised the requisite managerial control over either Mr. Gutierez or Mr. Valdovinos, and we will not speculate further on what evidence might support such a determination. Our conclusion, however, requires no remand given our holding concerning at least one participant, Mr. Chevez, is sufficient for application of the enhancement.

Turning to Mr. Garcia's next contention concerning the reliability of the hearsay evidence presented in support of the enhancement, we turn to the issue of Special Agent Namanny's testimony, concentrating on the evidence establishing Mr. Garcia's management or control over Mr. Chevez. In this case, Special Agent Namanny was directly involved in the investigation of the drug trafficking organization in which Mr. Garcia participated. As part of that investigation, he participated in an interview of Mr. Chevez and also conducted two interviews with Mr. Verjer-Flores, another participant in the organization. While those individuals did not testify, and Special Agent Namanny did not himself interview Mr. Valdovinos or participate in the other interview with Mr. Chevez, he gave his

hearsay accounts of those interviews at the sentencing hearing. As previously noted, hearsay statements may be used at sentencing so long as they possess some "minimum indicia of reliability" in the record.

As to the reliability of Special Agent Namanny's testimony, the record demonstrates he comprehensively interviewed the law enforcement officers who conducted interviews of the organization's participants as well as thoroughly reviewed their reports as a part of his investigation into the drug trafficking organization. Nothing in the record suggests his account of any of the interviews or subsequent reports was incorrect or otherwise unreliable. We also note Mr. Garcia does not question the reliability of the other law enforcement officers' accounts of their interviews with the drug organization participants. Instead, he focuses on the unreliability of the drug organization participants themselves, stating their interview statements were uncorroborated. We disagree.

Again, we concentrate on the reliability of Mr. Chevez's statements, as corroborated by other evidence. Two other participants separately identified Mr. Garcia as "Primo," which is sufficient to corroborate Mr. Chevez's identification of Mr. Garcia as "Primo" in the organization. In addition, Mr. Garcia was stopped in the Memphis area driving the same green Honda Mr. Chevez stated Mr. Garcia provided him just days later in Long Beach with instructions for him

to take it and the five pounds of methamphetamine to Des Moines.  Despite Mr. Garcia's contentions otherwise, he has not countered the government's evidence by showing it was someone else and not him driving the vehicle when it was stopped in Memphis and the driver provided a California driver's license for Orlin Garcia.

Furthermore, Mr. Chevez's testimony Mr. Garcia told him he would fly from California to meet Mr. Chevez in Des Moines corresponds with Mr. Valdovinos's and Mr. Verjer-Flores's statements Mr. Garcia often flew from California to Des Moines to pick up money from his drug sales and then traveled back to California in a vehicle with the money.  The one-way airline ticket in Mr. Garcia's name and possession for a flight from Long Beach to Des Moines lends further support to these statements.  In addition, surveillance established Mr. Chevez used another vehicle, a green Ford Focus, for the purpose of an apparent methamphetamine delivery, which was the vehicle Mr. Garcia was stopped in at the time of his arrest in the instant offense, further illustrating that on at least one other occasion Mr. Chevez used a vehicle connected with Mr. Garcia.  Further corroborating Mr. Chevez's account, for the purpose of illustrating Mr. Garcia's management role in the drug trafficking organization, was Mr. Garcia's $5,800 purchase of a repeater and five portable hand-held radios, which Special Agent Namanny testified are commonly used to communicate in drug trafficking

-18-

organizations. If Mr. Garcia was merely a participant in the drug organization, it is unlikely he would have either needed or purchased this quantity of equipment. While this purchase alone might not directly implicate Mr. Garcia, it, together with the other evidence, supports Mr. Chevez's statements implicating Mr. Garcia as a manager in the drug trafficking organization.

Thus, we hold sufficient evidence corroborated Mr. Chevez's statements concerning Mr. Garcia's management role in the drug trafficking organization, lending those statements the indicia of reliability required. Consequently, no error occurred in the district court's application of the two-level enhancement under § 3B1.1 for the purpose of demonstrating his sentence is procedurally unreasonable. Because Mr. Garcia has not raised an argument on appeal that his sentence is substantively unreasonable, we need not address that issue, other than to point out that because the district court correctly applied the relevant Guidelines range and sentenced Mr. Garcia within that range, his sentence is presumptively reasonable, and Mr. Garcia has not carried his burden in demonstrating his sentence is unreasonable under the § 3553(a) sentencing factors. *Kristl*, 437 F.3d at 1053-55; *see also Rita v. United States*, ___ U.S. ____, 127 S. Ct. 2456, 2462, 2465 (2007).

III. Conclusion

For these reasons, we **AFFIRM** Mr. Garcia's sentence.


                        **Entered by the Court:**

                        **WADE BRORBY**
                        United States Circuit Judge